## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

ALEXIS MARQUEZ,

        Plaintiff,                        18-cv-07315

    v.

                                            **COMPLAINT**

DOUGLAS HOFFMAN,
SALIANN SCARPULLA,
GEORGE SILVER,                            *Jury Trial Demanded*
LAWRENCE MARKS,
JOHN MCCONNELL,
LAUREN DESOLE,
KAY-ANN PORTER,
LISA EVANS,
LORI SATTLER,
DENIS REO,
EUGENE FAHEY,
PAUL FEINMAN,
MICHAEL GARCIA,
JENNY RIVERA,
LESLIE STEIN,
ROWAN WILSON,
in their individual capacities,

and JANET DIFIORE,
in her individual capacity and in her official
capacity as Chief Judge of New York State,

        Defendants.

---------------------------------------------------------------- X

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT.................................................................. 4

II.    JURISDICTION AND VENUE ............................................................... 10

III.   PARTIES ................................................................................................. 10

IV.   DISCRIMINATION AND RETALIATION BY INDIVIDUAL DEFENDANTS..... 12

     Douglas Hoffman .................................................................................. 12

         Initial Conduct ............................................................................. 12

         October 8 Email ........................................................................... 17

         Subsequent Conduct.................................................................... 19

         Additional Allegations ................................................................ 23

     Saliann Scarpulla................................................................................. 26

         Initial Conduct ............................................................................. 27

         October 20 Letter ........................................................................ 30

         Additional Allegations ................................................................ 31

     George Silver and Denis Reo............................................................... 33

         Initial Conduct ............................................................................. 34

         October 31 Interview ................................................................... 35

         Subsequent Conduct.................................................................... 36

         Additional Allegations ................................................................ 38

     Kay-Ann Porter .................................................................................... 43

         Summary ....................................................................................... 43

         Additional Allegations ................................................................ 48

Lauren DeSole ........................................................................................ 50

    Initial Conduct .............................................................................. 50

    November 22 Complaint ................................................................ 53

    Additional Allegations .................................................................. 55

Lisa Evans ............................................................................................. 58

    Summary ....................................................................................... 58

    Additional Allegations .................................................................. 61

John McConnell ..................................................................................... 63

Lawrence Marks ..................................................................................... 66

Janet DiFiore ......................................................................................... 70

Eugene Fahey, Paul Feinman, Michael Garcia, Jenny Rivera,

Leslie Stein, and Rowan Wilson ........................................................... 73

Lori Sattler ............................................................................................. 75

V.       RETALIATORY REVISION OF THE COURT SYSTEM'S SEXUAL

        HARASSMENT POLICY ................................................................... 77

VI.     SYSTEMIC DISCRIMINATION AND RETALIATION IN THE NEW YORK

        STATE COURT SYSTEM ..................................................................... 84

        A Longstanding Problem ................................................................. 84

        No Complaint Process ...................................................................... 88

        Noncompetitive Hiring .................................................................... 92

        Culture of Retaliation ...................................................................... 96

VII.    COUNTS ............................................................................................... 101

VIII.   PRAYER FOR RELIEF ........................................................................ 116

I.        **PRELIMINARY STATEMENT**

1.        Alexis Marquez ("Plaintiff") is a female attorney who worked as a law clerk to New York State Supreme Court Justice Saliann Scarpulla from 2012 to 2017.

2.        In September 2017, Plaintiff began working as the principal court attorney to New York State Acting Supreme Court Justice Douglas Hoffman.

3.        Starting in October 2017, approximately 17 New York State court system judges and attorneys deterred, suppressed, refused to respond to, and retaliated against Plaintiff for reporting and opposing sex-based harassment, discrimination, and retaliation by Hoffman.

4.        For over two months, Plaintiff attempted to navigate a fragmented, bewildering, and Kafkaesque gauntlet of judges and lawyers who tried to prevent her from documenting her complaints, denied that she had made any complaints, told her that her complaints were insufficient, and refused to respond to her complaints.  Throughout, Plaintiff was kept isolated in administrative limbo.  Supervisors and administrators repeatedly cut contact with her.  Officials refused to identify the decision-makers handling her complaints.  She was repeatedly warned not to talk to anyone.

5.        On November 22, 2017, Plaintiff submitted an 11-page complaint to Lauren DeSole, the court system's Director of Human Resources, supporting claims for sex- and race-based harassment, discrimination, and retaliation by Hoffman.  Plaintiff was immediately transferred and demoted.  Thereafter, court system officials refused to respond to Plaintiff's communications.

6.        On approximately December 1, 2017, Chief Administrative Judge Lawrence Marks promulgated a revision to the court system's state-wide sexual harassment policy.  The revision was not announced and, to date, has not been announced.  The revision consisted almost

4

entirely of deletions.  In all, Marks deleted approximately half of the court system's sexual harassment policy.  All changes to the policy were related either to the substance of Plaintiff's complaints or to the manner in which Plaintiff reported or pursued her complaints.  On information and belief, the court system's state-wide sexual harassment policy was revised directly in response to Plaintiff's complaints.

7.      On December 13, 2017, Plaintiff escalated her complaints directly to Marks.

8.      On December 15, 2017, Plaintiff was fired without any response or explanation. No court system official ever responded to any of Plaintiff's numerous complaints, including her 11-page complaint submitted to the court system's Director of Human Resources.

9.      Up until March 7, 2018, Plaintiff continued reporting and seeking an internal review of her complaints, an explanation for her firing, and an explanation for the revision to the court system's sexual harassment policy.  Plaintiff's complaints were reported throughout the entire administrative structure of the New York State court system.  She received no response.

10.      The following is a summary of each Defendant's conduct:

11.      Hoffman's harassment, discrimination, and retaliation were extensive and occurred over the course of five weeks.

12.      During the first three weeks of Plaintiff's employment with Hoffman, Hoffman engaged Plaintiff in relentless personal inquiries and conversation; suggested that Plaintiff should have lunch with him every day; told Plaintiff stories about past cases involving sexual relations; instructed Plaintiff to come or sit closer to him; invited Plaintiff to imagine she was married to him; invited Plaintiff to remove her suit jacket; asked Plaintiff to walk him to his car after work; showed Plaintiff personal texts and videos; constantly infantilized Plaintiff; constantly subjected Plaintiff to offensive and stereotypical jokes and comments; refused to

assign Plaintiff legal work; and attempted to treat Plaintiff as a wife, girlfriend, personal companion, and personal assistant.

13.     On October 8, 2017, Plaintiff asked Hoffman not to contact her on her personal email address.  Hoffman immediately became overtly hostile; became enraged and shouted at Plaintiff; berated Plaintiff for documenting her objection in writing; called Plaintiff rude, disrespectful, and disdainful; told Plaintiff that her job would not work out if she wanted a strictly professional relationship with him; stopped speaking to Plaintiff; and stopped assigning Plaintiff work.

14.     On October 18, 2017, Hoffman threatened to fire Plaintiff; threatened to have Plaintiff escorted from the building immediately; threatened to hurt Plaintiff; repeatedly demanded Plaintiff's silence as a condition of her continued employment; and told Plaintiff that George Silver, Deputy Chief Administrative Judge for New York City Courts, wanted to hire her as his principal court attorney.

15.     The retaliatory conduct of the remaining Defendants was extensive and occurred over the course of several months.

16.     Saliann Scarpulla, Supreme Court Justice of the New York State court system, told Plaintiff that she did not want to intervene; told Plaintiff to keep doing her job and to wait for Hoffman to make the first move; told Plaintiff not to worry because she would soon be working for Silver; berated Plaintiff for opposing Hoffman's conduct in writing; said that Silver was displeased with Plaintiff's opposition to Hoffman's conduct; said that Silver wanted to verify that Plaintiff was a "team player"; refused to respond to Plaintiff's written complaints about Hoffman; told Plaintiff to attend a job interview with Silver; and cut contact with Plaintiff.

17.     George Silver, Deputy Chief Administrative Judge of the New York State court system, converted Plaintiff's complaints against Hoffman into a job interview for his principal court attorney position; evaded and made himself unavailable to Plaintiff; gave Plaintiff a sham 5-minute interview; refused to handle Plaintiff's complaints against Hoffman; refused to respond to Plaintiff's job application; refused to hire Plaintiff; denied Plaintiff's transfer request; redirected Plaintiff's complaints against Hoffman, over Plaintiff's repeated objections, to the court system's Office of the Inspector General, which has no jurisdiction over complaints against judges; refused to respond to Plaintiff's communications; and cut contact with Plaintiff.

18.     Kay-Ann Porter, Managing Inspector General for Bias Matters of the New York State court system, refused to allow Plaintiff to document her complaints against Hoffman; refused to allow Plaintiff to document the complaint process; insisted that Plaintiff make her complaints orally and in person; refused to acknowledge or investigate any of Plaintiff's written complaints; repeatedly tried to document that Plaintiff was not interested in pursuing complaints against Hoffman; repeatedly tried to cut off all other complaint avenues pursued by Plaintiff; refused to identify the decision-makers handling Plaintiff's written complaints; deleted Plaintiff's written objections from the email record; and refused to respond to any of Plaintiff's repeated objections to the Inspector General's role, objectives, procedures, and conduct.

19.     Lauren DeSole, Director of Human Resources of the New York State court system, told Plaintiff that she would be fired within one week unless she provided additional information to support her complaints against Hoffman; refused to allow Plaintiff to document her complaints; refused to allow Plaintiff to document the complaint process; attempted to solicit Plaintiff's complaints orally and in person; discouraged Plaintiff from pursuing complaints against Hoffman; and encouraged Plaintiff to resign.  After Plaintiff submitted an 11-page

complaint to DeSole alleging sex- and race-based harassment, discrimination, and retaliation by Hoffman, DeSole immediately demoted Plaintiff; refused to explain the demotion; refused to identify the decision-makers handling Plaintiff's written complaints; refused to respond to Plaintiff's communications; and cut contact with Plaintiff.

20.     Lisa Evans, Assistant Deputy Counsel to the New York State court system, took control of the complaint process; refused to acknowledge Plaintiff's written complaints; instructed Plaintiff not to talk to anyone; began sending Plaintiff unresponsive letters by mail; refused to respond to Plaintiff's communications; refused to identify the decision-makers handling Plaintiff's written complaints; informed Plaintiff that she was fired; refused to provide any explanation for Plaintiff's firing; and refused to provide any response to any of Plaintiff's numerous written complaints.

21.     John McConnell, Counsel to the New York State court system, managed the court system's response to Plaintiff's complaints while refusing to identify himself; on information and belief, directed and coordinated the actions of Porter, DeSole, and Evans; refused to respond to Plaintiff's complaints; refused to respond to Plaintiff's communications; on information and belief, drafted the revision of the court system's sexual harassment policy; and stated, on behalf of Chief Judge Janet DiFiore, that the only appropriate forum for discussion of the court system's sexual harassment policy was in court.

22.     Lawrence Marks, Chief Administrative Judge of the New York State court system, approved, directed, and/or ratified the conduct of McConnell, DeSole, Porter, Evans, Silver, Scarpulla, and Hoffman; refused to respond to Plaintiff's complaints; refused to respond to Plaintiff's communications; made and/or approved the decision to demote Plaintiff; made

and/or approved the decision to fire Plaintiff; and deleted approximately half of the court system's sexual harassment policy.

23.     Janet DiFiore, Chief Judge of the New York State court system, approved and ratified the conduct of Marks, McConnell, DeSole, Porter, Evans, Silver, Scarpulla, and Hoffman; refused to respond to Plaintiff's complaints; refused to respond to Plaintiff's communications; and told Plaintiff, through McConnell, that the only appropriate forum for discussion of the court system's sexual harassment policy was in court.

24.     Eugene Fahey, Paul Feinman, Michael Garcia, Jenny Rivera, Leslie Stein, and Rowan Wilson, judges of the New York Court of Appeals, approved and ratified the conduct of all of the named Defendants; refused to respond to Plaintiff's complaints; refused to respond to Plaintiff's communications; and told Plaintiff, through John Asiello, Chief Clerk and Counsel to the Court of Appeals, that any further attempts to contact the members of the Court of Appeals directly would be improper.

25.     Lori Sattler, Supreme Court Justice, aided and abetted Hoffman's harassment, discrimination, and retaliation.

26.     Denis Reo, law clerk to George Silver, aided and abetted Silver's retaliation.

27.     Section V of this Complaint describes the retaliatory revision of the New York State court system's sexual harassment policy.

28.     Section VI of this Complaint provides a brief history of the court system's sexual harassment policy and describes several unlawful systemic conditions within the New York State court system that contributed to the harm sustained by Plaintiff, including the absence of a functioning internal complaint process, noncompetitive hiring practices for attorney positions, and a widespread culture of silence and retaliation.

29.     Defendants have intentionally and maliciously caused irreparable harm to Plaintiff and systemic damage to the institution of the New York State court system.  This is a set of facts that calls for personal liability, punitive damages, systemic injunctive relief, and external oversight of the New York State judiciary.

## II.     JURISDICTION AND VENUE

30.     This action arises under the Constitution of the United States and the laws of the United States, including 42 U.S.C. § 1983.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

31.     The supplemental jurisdiction of this Court is invoked over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

32.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the unlawful acts and practices alleged herein occurred in the Southern District of New York.

## III.     PARTIES

33.     Plaintiff is a female attorney in her thirties.

34.     Plaintiff was born in San Diego, California, to first generation Filipino immigrants.  She is brown-skinned, small in stature, personable, and youthful in appearance.

35.     Plaintiff is a graduate of Barnard College and Fordham Law School.  She is the first in her family to become an attorney.

36.     Prior to her employment in the New York State court system, Plaintiff worked or interned at the U.S. Department of Justice, the New York Attorney General's Office, the New York City Council, the U.S. State Department, and major New York law firms.

37.     Plaintiff was highly regarded universally by past employers, judges, lawyers, litigants, professors, and coworkers for her intellectual ability, work product, character, and ethical conduct.

38.     Plaintiff was a law clerk to Justice Saliann Scarpulla in New York Supreme Court for five years, from August 2012 to September 2017.  In 2014, Scarpulla and Plaintiff began serving in the court's Commercial Division, where Plaintiff managed numerous cases and wrote numerous judicial decisions on high profile, complex commercial matters.

39.     Plaintiff wrote judicial opinions and managed cases for Scarpulla largely independently.  The decisions Plaintiff wrote were featured frequently in the New York Law Journal or published in the court's official reporter.  Scarpulla told Plaintiff, "I barely edit your decisions."

40.     On information and belief, during her employment in the New York State court system, Plaintiff completed more, higher quality, and more complex legal work than Hoffman, Scarpulla, Silver, Marks, and DiFiore combined.

41.     Plaintiff began working for Hoffman on September 13, 2017.

42.     Defendants are public officials serving the State of New York.  Defendants are being sued in their individual capacities, except Janet DiFiore, who is being sued in both her individual and official capacities.

11

IV.     **DISCRIMINATION AND RETALIATION BY INDIVIDUAL DEFENDANTS**

**Douglas Hoffman**

43.     Douglas Hoffman is an Acting Justice serving in the Matrimonial Division of New York Supreme Court.  He has been a New York State judge since approximately 1996. From approximately 2009 to 2015, Hoffman was the supervising judge of Family Court in Manhattan.

44.     Plaintiff worked as Hoffman's principal court attorney for approximately five weeks, from September 13, 2017, to October 19, 2017.  During this period, Plaintiff's office was located in Hoffman's chambers at 111 Centre Street.  The chambers unit is small and consists of two rooms – Hoffman's office and Plaintiff's office – and a private chambers bathroom.  The courtroom and the rest of Hoffman's staff are located on a different floor of the building. Plaintiff was frequently alone with Hoffman in chambers.

*Initial Conduct*

45.     From the outset of Plaintiff's employment, Hoffman engaged in numerous behaviors that made Plaintiff acutely uncomfortable.

46.     Nearly all of the following conduct occurred during the first three weeks of Plaintiff's employment with Hoffman.

47.     Hoffman exhibited an obsessive need to speak to Plaintiff, get her attention, cause her to laugh, and obtain her approval.  This was so persistent that, when Hoffman and Plaintiff were in chambers together, Hoffman seemed incapable of leaving Plaintiff alone.

48.     Hoffman suggested that he and Plaintiff should have lunch together every day in his office.

12

49.     Hoffman told Plaintiff stories about past, unrelated cases involving sexual relationships and extramarital sex – e.g., a story about a porn star couple, a story about a couple who mutually agreed to engage in extramarital affairs.

50.     On multiple occasions, Hoffman invited or instructed Plaintiff to physically come or sit closer to him.

51.     Hoffman invited Plaintiff to envision a hypothetical in which she was married to him: "Imagine you and I are married…"

52.     Hoffman repeatedly asked Plaintiff to walk him to his car after work in the building's underground garage.

53.     Hoffman invited Plaintiff to take off her suit jacket and share his personal closet. He became angry when Plaintiff declined.

54.     Hoffman relentlessly engaged Plaintiff in personal inquiries and conversation beyond any ordinary or reasonable degree.  He constantly asked Plaintiff about her personal life, preferences, background, ethnicity, family, age, and a variety of other personal topics.  He constantly entered Plaintiff's office to engage her in personal conversation.  A clear majority of the interactions Hoffman initiated with Plaintiff – well over half – were personal in nature rather than work related.  Hoffman's personal inquiries were so persistent that they were invasive, coercive, disruptive, and a constant feature of Plaintiff's job.

55.     Hoffman repeatedly inquired with increasing specificity about Plaintiff's home address.

56.     Hoffman constantly shared his own personal information, preferences, experiences, plans, background, and family details with Plaintiff, as well as a variety of other personal details.

57.     Hoffman repeatedly shared personal texts and videos with Plaintiff.

58.     Hoffman repeatedly subjected Plaintiff to bizarre, off-color, stereotypical, or offensive comments, jokes, and non-sequiturs – including comments, jokes, and anecdotes involving race, multiple wives, or specific litigants.

59.     Hoffman repeatedly and without basis or foundation made negative or insulting remarks about the professional capabilities of female staff and employees.

60.     Hoffman repeatedly attempted to enlist Plaintiff in disparaging female employees and specific litigants.

61.     Hoffman persistently sought to overcome Plaintiff's discomfort and frequently made verbal disclaimers, such as, "I'm not weird but...", "I'm sorry, but I have to tell you...", "I can say that because...".

62.     Hoffman frequently tried to justify his actions, requests, and comments by presenting them as tenuously related to work assignments, or as part of jokes.

63.     Hoffman made it clear to Plaintiff that he expected her to fulfill stereotypically female roles and tasks.

64.     Hoffman told Plaintiff that it was her job to decorate his office.

65.     Hoffman told Plaintiff that it was her job to listen to him vent emotionally.

66.     Hoffman stood over Plaintiff as he waited for her to find places for him to shop for personal items.

67.     When Plaintiff used the word "independent" to describe her work process, Hoffman grimaced disapprovingly and told her that it was extremely important for her "to be nice and of service."

68.     Hoffman instructed Plaintiff on how to speak to him by imitating a gentle, sing-song female voice.

69.     Contrary to Plaintiff's title and job description, Hoffman assigned Plaintiff minimal legal work and assigned her secretarial, administrative, or paralegal work instead.

70.     Contrary to Plaintiff's work experience, Hoffman told Plaintiff that she lacked experience on issues within her expertise.

71.     Hoffman questioned Plaintiff's professional obligations to correct errors affecting litigants.

72.     Hoffman made repeated inquiries about Plaintiff's age, called Plaintiff "young lady," told her that the party was over when he found her working with a colleague, sang case names to her, joked that he wanted to say things about Plaintiff behind her back, and generally infantilized Plaintiff.

73.     Hoffman frequently indicated his expectations and instructions for Plaintiff by referring to his former female court attorney.

74.     Hoffman told Plaintiff that he and his former court attorney had lunch in his office together every day.

75.     Hoffman told Plaintiff that he and his former court attorney spent the entire day together every day.

76.     Hoffman told Plaintiff that his former court attorney would physically hover over him.

77.     Hoffman told Plaintiff that he and his former court attorney attended events together after work.

15

78.     Hoffman told Plaintiff that he and his former court attorney frequently communicated after work about personal matters.

79.     Hoffman showed Plaintiff a personal text message from his former court attorney which he had received the previous evening.

80.     In a brief phone call with Plaintiff, Hoffman's former court attorney nervously described working for Hoffman as being in a "marriage" and referred to him as "controlling" and like a "father figure."

81.     Hoffman actively attempted to isolate Plaintiff from other staff.

82.     Hoffman actively discouraged or outright prohibited Plaintiff from attending work-related meetings with other staff.

83.     Hoffman became displeased when Plaintiff interacted independently with litigants and others employees in the courthouse.

84.     Hoffman became displeased when Plaintiff revealed that she knew and had established working relationships with other judges, staff, or employees in the courthouse.

85.     Hoffman repeatedly attempted to monitor Plaintiff's communications.

86.     Hoffman repeatedly interfered with Plaintiff's work.

87.     Hoffman repeatedly avoided discussing work or law with Plaintiff, and consistently became dismissive, derisive, or angry whenever Plaintiff attempted to discuss work or law with him.

88.     After three weeks of working for Hoffman, Plaintiff was experiencing constant acute stress, stomach aches, and weight loss.

*October 8 Email*

89.    On Sunday, October 8, 2017, Hoffman sent an email to Plaintiff's personal email address.  In the email, Hoffman complimented Plaintiff's work on a written assignment and hoped that she was having a good weekend.

90.    Plaintiff replied that she was glad Hoffman liked her work on the assignment, hoped he was also having a good weekend, and asked him, in the future, not to email her at her personal email address, or on the weekend generally, unless it was an emergency ("October 8 Email").

91.    Hoffman did not reply.

92.    On Tuesday, October 10, 2017, when Hoffman and Plaintiff were next together in chambers, Hoffman was noticeably upset and angry.

93.    At approximately 10:15 A.M., Hoffman brought up Plaintiff's October 8 Email, suddenly became enraged, and began to yell at Plaintiff.

94.    Hoffman told Plaintiff, over and over, that her email was extremely rude, that it was very disrespectful, that she was an extremely rude person, and that she was extremely disdainful.

95.    Hoffman said he could not believe Plaintiff would send him an email like that.

96.    Hoffman told Plaintiff that she should not have put the email in writing, that she was supposed to talk to him in person about it, that this is how it was supposed to be handled – in person.

97.    Hoffman said Plaintiff should have thanked him for his email.

98.    Hoffman said he was personally offended.

17

99.     Hoffman said he had emailed Plaintiff on her personal email address because he thought she was nervous and worried, because she was submitting a written assignment to her boss for the first time, and because he thought that she had worked on it for a very long time.

100.    Hoffman said he thought Plaintiff wanted a mentor.

101.    Hoffman complained that he was not allowed to contact Plaintiff outside of work except in a life or death emergency.

102.    Hoffman continued yelling, berating Plaintiff, and repeating that Plaintiff was extremely rude and disrespectful, that Plaintiff should have thanked him for his email, and that Plaintiff should not have addressed the issue in writing.  This continued for approximately ten minutes.

103.    Plaintiff calmly told Hoffman several times that the reason she had sent him the email was to communicate a personal boundary.  She said she had not intended to personally offend him.

104.    Hoffman said that, after receiving Plaintiff's email, he had immediately called his former court attorney to get her opinion.  According to Hoffman, his former court attorney had said that she would have been very happy to receive Hoffman's email and that she would have thanked him.

105.    Hoffman then said slowly, as if in disbelief: "Well, you know, I just have to get used to the reality that you are not [my former court attorney] and that this is going to be a strictly professional relationship.  This may not work out."

106.    Hoffman added that he and his former court attorney "did the baby thing together."

107.     Hoffman said his former court attorney had agreed that it might not work out with Plaintiff.

108.     Plaintiff was highly disturbed and acutely uncomfortable.

109.     Plaintiff calmly said that she and Hoffman would have a professional relationship. She explained that she always has professional relationships with the people she works with. She explained that sometimes she might text coworkers outside of work, or go to lunch with them, but that this usually happened after a friendship had developed over time.

### *Subsequent Conduct*

110.     Following this conversation on October 10, 2017, Hoffman became overtly hostile.

111.     Hoffman stopped speaking to Plaintiff almost entirely.

112.     Hoffman stopped entering Plaintiff's office.

113.     Hoffman stopped giving Plaintiff new work assignments.

114.     Hoffman began avoiding Plaintiff entirely and using an alternate entrance to chambers.

115.     Hoffman and Plaintiff's interactions were mostly limited to email correspondence.

116.     Hoffman began attributing his own procedural errors to Plaintiff.

117.     Plaintiff began documenting her efforts to do her job and to fix procedural problems in Hoffman's part.

118.     The atmosphere in chambers became extraordinarily tense.

119.     This continued for approximately one week.

120.     Plaintiff expected to be fired at any moment.

121.    During this period, Plaintiff experienced acute stress, stomach aches, rapid weight loss, and difficulty breathing.

122.    On Wednesday, October 18, 2017, at approximately 11:00 A.M., after having avoided Plaintiff for over one week, Hoffman suddenly followed Plaintiff into her office, told Plaintiff that he wanted to speak to her at 4:30 P.M. that day, and refused to state the purpose of the conversation.

123.    At approximately 12:30 P.M., Hoffman again entered Plaintiff's office, closed the door, stood over Plaintiff, and spoke to her in a seething and malevolent tone, as if he were about to strike Plaintiff and was barely containing his rage.  He ordered Plaintiff not to attend a Matrimonial Division meeting at lunch, to take her lunch outside, and to finish all of her outstanding work when she returned.

124.    Plaintiff was alarmed by Hoffman's tone and physical proximity.

125.    At approximately 4:30 P.M., Hoffman spoke to Plaintiff again.  He was now calmer, read from prepared notes, and attempted to joke with Plaintiff.

126.    Hoffman told Plaintiff, "Sometimes it doesn't work out between a judge and a law clerk, even if they both want it to."

127.    Hoffman then began to list reasons for what he characterized as a professional mismatch.

128.    First, Hoffman told Plaintiff that her October 8 Email had been extremely rude and disrespectful.  He complained that Plaintiff had spoken to him about personal boundaries. He repeated several times that Plaintiff was rude, disdainful, and disrespectful.

129.    Second, Hoffman accused Plaintiff of having forgotten to send out a courtesy copy of a decision, which was factually incorrect.

130.    Third, Hoffman told Plaintiff that she had been rude and disrespectful in making "demands" to improve procedures in the part.  He insisted that it was not about "what" Plaintiff said but about "how" she said it.  He told Plaintiff that his previous court attorney would have used a much more deferential tone with him.  He imitated a gentle and feminine voice to demonstrate how Plaintiff should have addressed him.

131.    Hoffman then told Plaintiff that he had spoken to Deputy Chief Administrative Judge Silver.

132.    Hoffman said, "I spoke to Judge Silver and he told me that what happens in this situation – whenever there is a professional mismatch between a judge and a law clerk – is that they don't fire the law clerk immediately, but they give them a few weeks to find a transfer."

133.    Hoffman said Silver wanted to hire Plaintiff as his own principal court attorney.

134.    Hoffman said Silver knew that Plaintiff had worked for Scarpulla and that Scarpulla spoke very highly of Plaintiff.

135.    Hoffman said, "Judge Silver wants you to call him to arrange the transfer."

136.    Hoffman then told Plaintiff that he had the right to fire her immediately and to have a court officer escort her out of the building but that he would not do that if Plaintiff agreed not to say anything about him.

137.    Hoffman said that if Plaintiff agreed not to say anything about him, he would allow her to continue working for a couple of weeks and arrange a transfer.

138.    Hoffman said, approximately, "I will not say anything about you and you will not say anything about me."

139.    Hoffman asked twice for Plaintiff's "word" not to say anything about him.

140.    Hoffman told Plaintiff, "I don't want to hurt you."

141.   Hoffman called Plaintiff a nice person.

142.   Plaintiff said that she wanted a transfer and that she would call Silver in the morning.

143.   Plaintiff said she did not fully understand Hoffman's request not to say anything and asked if she could take some time to think about it.

144.   Hoffman reluctantly agreed to give Plaintiff one day to make a decision.

145.   On information and belief, after this conversation, because Plaintiff did not immediately give Hoffman her word to be silent, Hoffman, fearing that Plaintiff would report his conduct, began spreading false rumors about Plaintiff in order to preemptively discredit her, sabotage her transfer, and harm her reputation, professional relationships, and career.

146.   On Thursday, October 19, 2017, at approximately 9:15 A.M., Plaintiff called Silver's chambers and spoke to Denis Reo, Silver's law clerk.  Reo said that Silver was on vacation in Europe.  Reo said that Silver wanted to interview Plaintiff in the week of October 30, 2017, when he returned from vacation.

147.   After the call with Reo, Plaintiff struggled to concentrate on work.

148.   At approximately 3:30 P.M., Hoffman asked Plaintiff what she wanted to do.

149.   Plaintiff said that she had called Silver's office and that she was working on arranging a transfer.

150.   Hoffman again asked Plaintiff what she wanted to do.

151.   Plaintiff said that she wanted to maintain a professional and civil working relationship with Hoffman until her transfer became available.

152.   Hoffman asked, "But what do you want to do afterward?"

153.    Plaintiff was extremely uncomfortable and repeated that she wanted a transfer and that she wanted to maintain a professional and civil relationship in the meantime.

154.    Hoffman appeared tremendously relieved and his mood suddenly shifted.  He became happy and jovial.  After over one week of open hostility, Hoffman suddenly and immediately resumed speaking to Plaintiff, assigning work to Plaintiff, and entering Plaintiff's office in rapid succession.

155.    Plaintiff felt disoriented.

156.    On Friday, October 20, 2017, Plaintiff emailed Hoffman to inform him that she would be out sick for the day.

157.    On Monday, October 23, 2017, Plaintiff emailed Hoffman to inform him that she would be taking leave until her transfer was finalized and that she would forward her work email to a rotating law clerk.

158.    Hoffman did not reply.

159.    This was the last interaction between Plaintiff and Hoffman.

*Additional Allegations*

160.    In the week of October 23, 2017, Hoffman was involved in an altercation with a rotating female law clerk.  Hoffman attempted to fire the law clerk, took away her keys, told her that she would not have a job, and angrily complained about the staff's "civil service mentality." He later instructed the law clerk to return to his chambers as if nothing had happened.

161.    Hoffman repeatedly disparaged without basis the competence and diligence of female court staff, including a female judge, his rotating law clerk, his part clerk, and his former court attorney.  As a pattern, Hoffman deferred to male court employees and refrained from

criticizing male subordinate staff, even when they caused procedural errors affecting litigants or directly opposed Hoffman's orders.

162.    Hoffman repeatedly used the phrase "civil service mentality" to complain without basis about female and minority employees.

163.    Hoffman repeatedly brought up in conversation and ascribed significant importance to race, ethnicity, religious beliefs, and socio-economic status.

164.    Hoffman singled out individual litigants for derision.  On one occasion, he called a litigant "crazy" because the litigant was an Orthodox Jew.  On another occasion, he called a litigant a "deadbeat" because the litigant was a father who was in school rather than working.

165.    Hoffman constantly expected and demanded Plaintiff's affirmation and reinforcement of his various negative views on court system staff, litigants, and court system norms, rules, and procedures.  Hoffman's former court attorney described Hoffman's view of their relationship as him and her "against the world."

166.    Hoffman lacked basic professional competence.  He was unversed and/or uninterested in basic Supreme Court procedures.  He was unversed and/or uninterested in law. He was unable to issue basic orders and judgments.  He appeared to act on ex parte communications from litigants.  He was uninterested in recording the outcomes of court appearances.  He was a frequent source of procedural and administrative errors.  He repeatedly drew corrections from senior clerical and administrative staff.  Other judges expressed surprise that Hoffman was unaware of basic procedures.  He appeared not to know how to process orders to show cause.  He did not know the difference between a final and non-final order.  He appeared incapable of communicating calendar information.  He required assistance to complete basic practical tasks.  He expressed open prejudice towards specific litigants.

167.    Hoffman claimed that he had been appointed to Supreme Court with a mandate to clear a case backlog.  He frequently made grand and categorical pronouncements, including but not limited to: "I don't make mistakes," "I take no stock in what other judges do," "I've reformed whole court systems," the public court calendar "doesn't need to be correct," and "we only need to follow some procedures."

168.    Hoffman exhibited frequent and sudden mood swings.

169.    Hoffman was secretive and displayed a persistent need to control information about himself.

170.    Hoffman engaged in a consistent, manipulative, and abusive pattern as he sought to train Plaintiff to fulfill the role of a wife, domestic partner, girlfriend, or personal companion: he always became superficially friendly, familiar, and ingratiating when he engaged Plaintiff on an intimate or personal level and always became hostile or irritable when Plaintiff attempted to engage him as a professional attorney.

171.    Prior to the October 8 Email, Hoffman had never complained about Plaintiff being rude, disdainful, or disrespectful.  During the first three weeks of Plaintiff's employment, Hoffman constantly directed relentless and close personal attention, conversation, questions, jokes, and songs at Plaintiff.

172.    Plaintiff continually made special efforts, entirely on her own initiative, to accommodate and assist Hoffman with various tasks he constantly struggled with.  For example, Plaintiff arranged Hoffman's files neatly every day, corrected his calendar every day, helped him locate missing files, attempted to reduce his administrative workload, created easy-to-use checklists for him, retrieved his glasses, retrieved his phone, requested that a stand be placed next to his bench, purchased a mail cart for chambers with her own funds, etc.

173.     Prior to hiring Plaintiff, Hoffman entered into an oral and written agreement with Plaintiff that he would primarily assign her legal work.  Prior to hiring Plaintiff, Hoffman entered into a separate oral agreement with Scarpulla that he would primarily assign Plaintiff legal work.  Hoffman primarily assigned Plaintiff secretarial, administrative, or paralegal work.  The overwhelming majority of work that Hoffman assigned to Plaintiff did not require a law degree to complete and was, at most, quasi-legal in nature, comparable to work frequently performed in New York Supreme Court by unpaid student interns.

174.     Hoffman, alone or in concert with others, attempted to bribe Plaintiff, bargain with Plaintiff, and obtain Plaintiff's silence in exchange for a transfer and a job as Silver's principal court attorney.

175.     Hoffman attempted to extort Plaintiff, bargain with Plaintiff, and obtain Plaintiff's silence by threatening to hurt Plaintiff, threatening to fire Plaintiff, threatening to make false statements about Plaintiff, and threatening to harm Plaintiff's reputation and career.

176.     Hoffman misused the authority of his public position and office to retaliate against Plaintiff and to assist others in retaliating against Plaintiff for opposing sex- and race-based harassment, discrimination, and retaliation.

177.     Hoffman intentionally violated multiple federal and state laws enumerated in Section VII of this Complaint and is unfit to serve as a New York State judge.

### Saliann Scarpulla

178.     Saliann Scarpulla is an elected Justice serving in the Commercial Division of New York Supreme Court.  She has been a New York State judge since approximately 2001.

179.     Scarpulla employed Plaintiff as her law clerk for approximately five years, from August 2012 to September 2017.  During this period, Scarpulla and Plaintiff developed a strong

26

working relationship.  Scarpulla relied extensively on Plaintiff's judgment, professionalism, loyalty, discretion, and work product.  Plaintiff managed numerous cases and wrote numerous judicial opinions, including many of Scarpulla's most high profile decisions, largely independently.

### *Initial Conduct*

180.    On Monday, October 16, 2017, Scarpulla summoned Plaintiff to her chambers. Her tone was urgent.  She asked Plaintiff what had happened with Hoffman but would not disclose what she had heard, or from whom.

181.    Plaintiff informed Scarpulla that there were numerous procedural errors in Hoffman's part and then said: "I also want you to know that he is very bothered by the fact that he can only have a professional relationship with me."

182.    Plaintiff told Scarpulla that Hoffman made her feel uncomfortable, that he had suggested having lunch together every day, and that he had been very close with his former court attorney.

183.    Scarpulla said that she did not want to intervene: "I don't want to intervene because I don't want it to look like I'm meddling."

184.    Scarpulla said, "Just keep doing your job and let him make the first move."

185.    Scarpulla said she had two other principal court attorney positions in mind for Plaintiff that she would soon be able to disclose.  She stressed that these were "real" positions but would not tell Plaintiff what these jobs were.

186.    On Wednesday, October 18, 2017, at approximately 2:00 P.M., Scarpulla left a message for Hoffman asking for a call back.

187.    At approximately 4:30 P.M., Hoffman threatened to fire Plaintiff, threatened to have her escorted from the building immediately, threatened to hurt her, and repeatedly demanded her silence as a condition of her continued employment.

188.    At approximately 8:30 P.M., Scarpulla and Plaintiff spoke on the phone.

189.    Plaintiff informed Scarpulla that Hoffman had threatened to fire her; that Hoffman had threatened to have her escorted from the building; that Hoffman had prohibited her from attending a work meeting; that Hoffman had warned her not to say anything about him; that Silver wanted to hire her as his principal court attorney; and that Hoffman would allow her to arrange the transfer only if she agreed not to say anything about Hoffman.

190.    Scarpulla told Plaintiff not to worry because Silver would soon hire her: "Everything will work out much better when you work for Judge Silver."

191.    Scarpulla instructed Plaintiff to call Silver in the morning to arrange the transfer.

192.    About Hoffman's conduct, Scarpulla said only, "What is there to talk about?" She cut Plaintiff off several times.  She called Hoffman an asshole and said, "I should have known he'd be a problem."

193.    At approximately 9:30 P.M., Scarpulla and Plaintiff spoke on the phone again.

194.    This time, Scarpulla was angry: "What is this I'm hearing about an email?"

195.    Scarpulla told Plaintiff that Silver was displeased with her October 8 Email to Hoffman.

196.    Plaintiff attempted to explain that the email was intended to communicate a personal boundary but Scarpulla cut her off: "Other judges don't see it that way."

197.    Scarpulla berated Plaintiff: "You should not have sent him that email."

198.    She said, "That was not your best moment."

28

199.    About Hoffman, Scarpulla said, "He just wants a best friend."

200.    Scarpulla interrupted Plaintiff multiple times, talked over her, and would not let her speak.

201.    Scarpulla then told Plaintiff that, instead of transferring her directly, Silver now wanted to interview her.

202.    She said, "Judge Silver wants to know you're a team player."

203.    Scarpulla told Plaintiff that, instead of calling Silver directly, she should call Silver's law clerk in the morning.  She said Silver would be on vacation.  She told Plaintiff that she would become acting Administrative Judge on Friday, in Silver's absence.

204.    This phone call was the first time in five years that Scarpulla berated or addressed Plaintiff with anger.

205.    On Thursday, October 19, 2017, at approximately 9:10 A.M., Plaintiff called Silver's chambers.  Reo, Silver's law clerk, took the call and told Plaintiff, "Judge Silver is on vacation in Europe."  Reo said Silver wanted to interview Plaintiff in the week of October 30, 2017, when he returned from vacation.

206.    A few minutes later, at approximately 9:15 A.M., Scarpulla called Plaintiff and said, "Judge Silver just texted me and said you should call his chambers right now."

207.    Plaintiff informed Scarpulla that she had just spoken to Reo and that Silver would not interview her until the week of October 30, 2017.

208.    Scarpulla replied, "Okay great," and hung up.

209.    At approximately 12:30 P.M., Plaintiff overheard Scarpulla shouting loudly on the phone, "*That is so fucked up!  He sent that email to her personal email account!  He is her boss!  This is her career!*"

210.     A few minutes later, Scarpulla cancelled a meeting with Plaintiff by texting, "Not today. Let's talk next week."

211.     This was the first time in five years that Scarpulla declined to meet with Plaintiff.

***October 20 Letter***

212.     On Friday, October 20, 2017, Plaintiff hand delivered a letter to Scarpulla ("October 20 Letter").

213.     The letter described in detail how Hoffman had threatened to fire Plaintiff, threatened to hurt her, and had repeatedly demanded her silence as a condition of her continued employment.  The letter described Plaintiff as fearful of Hoffman's physical presence.  The letter stated that Plaintiff had been unable to establish a professional working relationship with Hoffman.  The letter stated that Plaintiff was unable to return to work, was feeling isolated, and was concerned about reprisal to her career.  The letter stated that Plaintiff was seeking Scarpulla's advice on how to resolve the situation.

214.     At approximately 6:00 P.M., Scarpulla and Plaintiff spoke on the phone.

215.     Scarpulla's tone was formal and peremptory: "This is going to be a very short phone call."  Scarpulla told Plaintiff that she had received her letter.  She said, "I am a Title VII reporter and I am required to write a letter back in response."  Scarpulla said her letter would contain instructions for Plaintiff.  She said that, in the meantime, Plaintiff could report sexual harassment to Silver.

216.     Plaintiff said she would wait to receive Scarpulla's letter.

217.     Scarpulla was reluctant to engage Plaintiff in further conversation.  She kept repeating that she was required to send Plaintiff a letter with instructions and appeared to be trying to end the call.

218.    Plaintiff pressed Scarpulla and said she was concerned that Hoffman was interfering with her transfer to Silver.

219.    Scarpulla told Plaintiff that her transfer to Silver was not in jeopardy.

220.    Scarpulla told Plaintiff to attend the interview with Silver when he returned from vacation.

221.    About Hoffman, Scarpulla said only, "Who cares what he says to other people? Judge Silver isn't even listening to him."  She said, approximately, "Judge Silver knows who is worth listening to and who is a loser."  Scarpulla did not ask questions about Hoffman or any of the issues raised in the October 20 Letter.

222.    Plaintiff told Scarpulla that she could not return to work for Hoffman the following week.  Scarpulla began to say, "But then he…," but stopped herself and said instead, "Okay, don't get sick."

223.    At the end of the call, Scarpulla said, "I want you to know that I am not abandoning you.  I know who you are.  My opinion of you has not changed since a month ago."

224.    This call was the last communication between Scarpulla and Plaintiff.

225.    Scarpulla cut all contact with Plaintiff.

226.    Plaintiff waited for but never received a letter with instructions from Scarpulla.

227.    Plaintiff was subsequently out of work for approximately 5 weeks.

228.    Plaintiff was out of work and out of contact with the court system while she waited for the interview with Silver.

### *Additional Allegations*

229.    On information and belief, during the following two weeks, Scarpulla avoided her law clerks.  On Monday, November 6, 2017 – after Plaintiff reported Hoffman's conduct to

31

Silver in writing and raised questions about Silver's hiring practices – Scarpulla vaguely told her law clerks that Plaintiff's employment with Hoffman was not going well and that there was nothing she could do to help.

230.    Scarpulla, alone or in concert with others, attempted to bribe Plaintiff, bargain with Plaintiff, and obtain Plaintiff's silence in exchange for job information, a transfer, and a job as Silver's principal court attorney.

231.    In the course of handling Plaintiff's complaints, Scarpulla made numerous fraudulent representations and/or omissions, and Plaintiff relied on those representations and/or omissions to her detriment, including but not limited to: that Scarpulla was a "Title VII reporter"; that Scarpulla could not address Plaintiff's complaints directly and needed to send Plaintiff a letter with instructions instead; that Scarpulla intended to send Plaintiff a letter with instructions; that Scarpulla would otherwise follow up with Plaintiff; that Silver was either on vacation or unavailable, and could neither communicate with, transfer, or interview Plaintiff from October 18, 2017, to October 31, 2017; that Silver intended to hire and transfer Plaintiff; that Silver was not retaliating against Plaintiff; that Silver was not even listening to Hoffman; that Silver knew who was worth listening to and who was a loser; that the appropriate way for Plaintiff to resolve her harassment, discrimination, and retaliation complaints about Hoffman was to attend a job interview with Silver.

232.    Plaintiff worked for Scarpulla for five years on a first year salary grade.  During this same period, Scarpulla advanced her judicial career on the strength of Plaintiff's work product.

233.    Scarpulla misused the authority of her public position and office to retaliate against Plaintiff and to assist others in retaliating against Plaintiff for opposing sex- and race-based harassment, discrimination, and retaliation.

234.    Scarpulla supervised, failed to supervise, permitted, contributed to, and/or failed to remedy intentional and/or negligent torts and unlawful conduct committed against Plaintiff by Hoffman, Silver, and Reo.

235.    Scarpulla repeatedly ignored, failed to comply with, and refused to enforce the court system's sexual harassment and discrimination policies.

236.    Scarpulla intentionally violated multiple federal and state laws enumerated in Section VII of this Complaint and is unfit to serve as a New York State judge.

**George Silver and Denis Reo**

237.    George Silver is the Deputy Chief Administrative Judge for New York City Courts.  He is responsible for overseeing day-to-day operations, ensuring the orderly administration of the courts, and supervising the conduct of judges and nonjudicial employees in all trial-level courts in New York City.

238.    Silver is the third most powerful executive officer in the New York State court system.  He has been a New York state judge since approximately 2004.

239.    Denis Reo is Silver's principal law clerk.  On information and belief, Reo has worked for Silver since approximately the beginning of Silver's judicial career.

*Initial Conduct*

240.     Between approximately Monday, October 16, 2017, and Wednesday, October 18, 2017, Silver engaged in conversations with Hoffman and Scarpulla about Plaintiff and Plaintiff's employment situation.

241.     On Wednesday, October 18, 2017, Hoffman threatened to fire Plaintiff, threatened to have her escorted from the building immediately, threatened to hurt her, and repeatedly demanded her silence as a condition of her continued employment.

242.     Both Hoffman and Scarpulla separately informed Plaintiff that Silver wanted to hire her as his own principal court attorney.  Both instructed Plaintiff to call Silver directly to arrange the transfer.

243.     Shortly thereafter, Silver learned of Plaintiff's October 8 Email to Hoffman.

244.     Silver immediately expressed disapproval of Plaintiff's October 8 Email.

245.     Silver immediately expressed a desire to verify that Plaintiff was a "team player."

246.     Silver immediately made himself unavailable to Plaintiff, lied that he was on vacation, coordinated with Scarpulla and Reo to ensure that Plaintiff did not contact him directly, and arranged to interview Plaintiff instead of hiring and transferring Plaintiff directly.

247.     On Thursday, October 19, 2017, at approximately 9:10 A.M., Plaintiff called Silver's chambers to request a transfer.  Reo took the call and told Plaintiff: "Judge Silver wants to interview you.  Judge Silver is on vacation in Europe.  He can interview you when he gets back on the week of October 30."  The call lasted approximately one minute.  Reo did not mention or discuss the position Plaintiff would interview for.

248.     Silver then learned of the October 20 Letter to Scarpulla and the complaints contained therein, including but not limited to:

a.      that Plaintiff had been unable to establish a professional working

relationship with Hoffman;

b.      that Hoffman had threatened to fire Plaintiff;

c.      that Hoffman had threatened to hurt Plaintiff;

d.      that Hoffman had repeatedly demanded Plaintiff's silence as a condition of

her continued employment;

e.      that Plaintiff was unable to return to work.

249.    Silver scheduled Plaintiff for an interview on Tuesday, October 31, 2017, the

busiest day of his court calendar.

250.    Plaintiff was out of work and out of contact with the court system while she

waited to interview with Silver.

251.    Silver was aware that Plaintiff was unable to return to work for approximately

two weeks while she waited to interview with him.

252.    During this time, from approximately Monday, October 16, 2017, to Tuesday,

October 31, Silver made no attempt to contact or communicate with Plaintiff directly.

### *October 31 Interview*

253.    On Tuesday, October 31, 2017, Silver and Reo conducted a sham interview of

Plaintiff.

254.    The interview was ostensibly intended to evaluate Plaintiff for a permanent

position as Silver's principal court attorney, a high level legal job in the New York State court

system that involves managing Silver's cases and writing Silver's judicial opinions.

255.    The interview lasted approximately 5 minutes.

256.    The interview consisted of four brief questions.

257.    One of the four questions was, approximately: "Whom did you work for at the City Council?"

258.    Silver made no attempt to discuss or evaluate the quality of Plaintiff's work.

259.    Silver did not mention Hoffman or ask any questions about Hoffman.  He did not ask why Plaintiff was interviewing or available for a position as Silver's principal court attorney.

260.    Silver and Reo were stilted, awkward, or afraid of interacting with Plaintiff.

261.    At the end of the 5-minute interview, in response to Plaintiff's question about Silver's responsibilities as Deputy Chief Administrative Judge, Silver said, approximately, "We do a lot of things."

### *Subsequent Conduct*

262.    On Thursday, November 2, 2017, Reo informed Plaintiff that he could not give her a firm date when Silver would make his hiring decision.

263.    Plaintiff emailed Reo and informed him that her situation was urgent.

264.    Plaintiff explained that Hoffman had threatened to fire her, threatened her, and demanded her silence as a condition of her continued employment.  She explained that she had been unable to return to work for over two weeks.  She expressed a number of concerns, including that she was being asked to participate in an undocumented process to resolve the situation.  She noted that Silver had given her a 5-minute interview.  She asked Reo a number of questions about Silver's hiring process.

265.    On Friday, November 3, 2017, Reo replied to "make clear" that Silver's hiring process was "not in any way related to any other matter."  He denied the suggestion that Silver's interview was "in some way related to a transfer you are seeking as a result of your employment with Judge Hoffman."  He flatly and falsely claimed that he had independently contacted

Plaintiff on Wednesday, October 18, 2017, to solicit her application for Silver's position.  He

made statements and misrepresentations on behalf of Scarpulla.  He asserted that Silver had been

aware of the October 20 Letter but that he had not actually read it.  He asserted that the October

20 Letter contained no specific details.  He seemed to fault Plaintiff for not making reports and

for withholding information.

266.    Reo's email was adversarial, defensive, and unresponsive to Plaintiff's concerns.

It contained numerous misstatements, omissions, bizarre contortions, and obfuscations, all

designed to disclaim Silver's knowledge or involvement.

267.    Reo did not answer any of Plaintiff's questions regarding Silver's hiring process.

268.    At the conclusion of the email, Reo stated that Silver had decided to refer the

matter to the Inspector General of the Unified Court System "for investigation."

269.    On Monday, November 6, 2017, Plaintiff emailed Reo again.

270.    She noted that the Office of the Inspector General is responsible for investigating

the misconduct of nonjudicial employees and asked for a clarification.

271.    Reo did not respond.

272.    On Wednesday, November 8, 2017, Plaintiff emailed Reo again.

273.    She informed Reo that Hoffman had attempted to fire a second law clerk.  She

repeated that Hoffman had improperly threatened to fire her, threatened her, and demanded her

silence.  She repeated that she had been unable to return to work.  She noted that Reo's email

contained a number of factual inaccuracies.  She noted once again that the court system's

Inspector General is responsible for investigating the misconduct of nonjudicial employees,

asked why her conduct was being investigated, and requested a copy of the complaint that had

been filed with the Office of the Inspector General.  She noted that there did not appear to be a

reliable and trustworthy mechanism through which law clerks could resolve personnel issues with judges without risking reprisal and severe threats to their careers.  She again asked Reo a number of questions related to her employment status and Silver's hiring process.

274.   Reo did not respond.

275.   Approximately 30 minutes later, Kay-Ann Porter from the Office of the Inspector General left a voicemail on Plaintiff's cellphone.

276.   Silver and Reo cut contact with Plaintiff entirely.

277.   Silver and Reo never responded to any of Plaintiff's communications, questions, complaints, and objections related to Hoffman, Silver's hiring process, Plaintiff's employment status, the court system's complaint process, or the Office of the Inspector General.

278.   Even as Silver cut contact and refused to respond to Plaintiff, he took possession of the private and confidential October 20 Letter to Scarpulla and redirected that letter to the Office of the Inspector General.

279.   Silver did this while repeatedly refusing to answer Plaintiff's questions about the jurisdiction and function of the Office of the Inspector General.

280.   Silver did this without giving Plaintiff notice and without asking or obtaining Plaintiff's permission.

281.   Besides the October 20 Letter, Silver withheld all additional information from the Office of the Inspector General.

282.   Silver never responded to Plaintiff's job application.

*** Additional Allegations ***

283.   Silver conditioned Plaintiff's transfer and employment on whether Plaintiff pursued harassment, discrimination, and retaliation complaints against Hoffman.

284.    Silver converted Plaintiff's harassment, discrimination, and retaliation complaints against Hoffman into a job interview for his principal court attorney position.

285.    Silver, alone or in concert with others, attempted to bribe Plaintiff, bargain with Plaintiff, and obtain Plaintiff's silence in exchange for a transfer and a job as Silver's principal court attorney.

286.    Silver misused the court system's Office of the Inspector General and attempted to launch a fraudulent government investigation in order to suppress complaints about his own conduct and deflect questions about his hiring practices.

287.    Silver's initial retaliatory acts included, but were not limited to, evading and making himself unavailable to Plaintiff; using subordinates to block Plaintiff's access and communications to Silver; expressing disapproval of Plaintiff's opposition and complaints; expressing a desire to verify that Plaintiff was a "team player"; converting Plaintiff's transfer request and harassment, discrimination, and retaliation complaints into a job application subject to rejection; conducting a sham interview of Plaintiff; refusing to evaluate or consider Plaintiff's job application; ignoring Plaintiff's complaints; delaying Plaintiff's complaints; and falsely disclaiming knowledge of Plaintiff's complaints.

288.    When Silver could no longer evade, ignore, and disclaim knowledge of Plaintiff's complaints, Silver refused to transfer Plaintiff; refused to hire Plaintiff; refused to respond to Plaintiff's job application; refused to respond to Plaintiff's communications; and cut contact with Plaintiff.

289.    Silver refused to personally address or respond to Plaintiff's complaints against Hoffman.

290.    Silver failed and refused to refer Plaintiff's complaints against Hoffman to the New York State Commission on Judicial Conduct.

291.    Instead, Silver, without giving Plaintiff notice, and without asking or obtaining Plaintiff's permission, redirected Plaintiff's complaints to the court system's Office of the Inspector General – an internal office that operates in secret and reports to Silver; has no jurisdiction to investigate Plaintiff's complaints; has no jurisdiction to investigate Hoffman, Silver, Scarpulla, or any other judge; operates to suppress evidence and documentation of complaints against judges; and operates to prevent, obstruct, and evade internal and external review of its operations.  *See infra* Kay-Ann Porter.

292.    Silver redirected Plaintiff's complaints to the Office of the Inspector General with the intent of suppressing them.  Silver refused to explain his decision to redirect Plaintiff's complaints to the Office of the Inspector General.  He refused to respond to Plaintiff's questions, concerns, and objections regarding the Office of the Inspector General.  He failed to inform Plaintiff of other complaint avenues and attempted to prevent Plaintiff from pursuing other complaint avenues.

293.    As Deputy Chief Administrative Judge, Silver is formally tasked with supervising the day-to-day conduct of judicial and nonjudicial employees in New York City trial-level courts.  It is his designated role and function to supervise judges and to intervene on behalf of a law clerk who is being harassed and threatened by a judge.  By contrast, resolving personnel matters is not the function of the Office of the Inspector General, which cannot address such issues immediately and has no jurisdiction or authority over judges.

294.    Silver refused to address multiple employment-related matters that required immediate attention, including Plaintiff's assertion that she had no contact with the court system

and had been unable to return to work for several weeks.  After reporting to Silver that she had been threatened by a judge and was unable to return to work, Plaintiff spent approximately one additional week without any contact from the court system.

295.    According to Silver, a written report including a detailed timeline describing a judge threatening to hurt a law clerk and repeatedly demanding her silence as a condition of her continued employment does not provide "any specific details."

296.    In the course of handling Plaintiff's complaints, Silver made numerous fraudulent representations and/or omissions, and Plaintiff relied on those representations and/or omissions to her detriment, including but not limited to: that Silver was either on vacation or unavailable, and could neither communicate with, transfer, or interview Plaintiff from October 18, 2017, to October 31, 2017; that Silver intended to evaluate and consider Plaintiff's job application; that Silver's job interview was not in any way connected to Plaintiff's employment with Hoffman; that Silver could not personally respond to and address Plaintiff's complaints; that Silver had properly referred Plaintiff's complaints to the Office of the Inspector General; and that the Office of the Inspector General had the requisite authority, intent, or independence to investigate Plaintiff's complaints.

297.    Silver misappropriated and mishandled Plaintiff's private and confidential information and communications.

298.    Plaintiff was highly qualified and highly recommended for Silver's principal court attorney position.

299.    On October 18, 2017, there were no other candidates for Silver's principal court attorney position.

41

300.    On information and belief, on October 31, 2017, there were no other candidates for Silver's principal court attorney position.

301.    On information and belief, Silver filled the position and hired a principal court attorney in approximately December 2017.

302.    The opening for Silver's principal court attorney position was not announced either publicly or internally.  As with the overwhelming majority of attorney jobs within the New York court system, neither members of the public nor court system staff could learn about or apply for the position.  *See infra* Noncompetitive Hiring.

303.    Silver refused to perform the functions of the Deputy Chief Administrative Judge for New York City Courts and the functions of the Administrative Judge for the First Judicial District of the New York State court system.

304.    Silver misused the authority of his public positions and offices to retaliate against Plaintiff and to assist others in retaliating against Plaintiff for opposing sex- and race-based harassment, discrimination, and retaliation.

305.    Silver supervised, failed to supervise, permitted, contributed to, and/or failed to remedy intentional and/or negligent torts and unlawful conduct committed against Plaintiff by Hoffman, Scarpulla, McConnell, DeSole, Porter, Evans, and Reo.

306.    Silver repeatedly ignored, failed to comply with, and refused to enforce the court system's sexual harassment and discrimination policies.

307.    Silver is professionally incompetent.  He refused to respond to communications from a law clerk who alleged that she was being threatened by a judge.  He refused to handle and intentionally mishandled a harassment, discrimination, and retaliation complaint against a sitting

judge under his direct supervision.  He attempted to convert a harassment, discrimination, and retaliation complaint against a judge into a job interview.

308.    Silver intentionally violated multiple federal and state laws enumerated in Section VII of this Complaint and is unfit to serve as the Deputy Chief Administrative Judge of the New York State court system.

309.    Reo acted as Silver's agent, under Silver's direction, and on Silver's behalf.

### Kay-Ann Porter

*Summary*

310.    Kay-Ann Porter is the Managing Inspector General for Bias Matters of the New York State court system.  She is responsible for investigating bias complaints within the court system, including employee claims of sex- and race-based harassment, discrimination, and retaliation.

311.    Porter has no authority to investigate complaints against judges.  Her office is "responsible for the investigation and elimination of infractions of disciplinary standards, criminal activities, conflicts of interest, misconduct, misfeasance and incompetence on the part of *nonjudicial employees*."  *Office of the Inspector General*, New York Courts, http://ww2.nycourts.gov/admin/ig/index.shtml (last visited Jul. 23, 2018) (emphasis added); *see also* Annual Meeting Minutes (Mar. 14, 2016), *in* N.Y. State Judicial Comm. on Women in the Courts, *Local Gender Bias and Gender Fairness Committees Annual Reports 2016-2017* 266 (2017), https://www.nycourts.gov/ip/womeninthecourts/pdfs/2016-17-Annual-Reports.pdf (according to Evans, the Office of the Inspector General has no jurisdiction over judges).

312.    The fact that Porter has no authority to investigate complaints against judges is not clearly indicated anywhere in either the court system's policies or its website.

313.    On information and belief, Porter has never investigated, interviewed, or questioned a judge accused of sexual harassment, discrimination, or retaliation.

314.    Porter reports to Silver and operates in secret.  The Office of the Inspector General does not disclose any findings or reports related to its bias investigations, either to complainants or the targets of its investigations.  The only way for a complainant to access a report prepared by Porter is through discovery in court.

315.    Plaintiff asked repeatedly why her complaints against a judge were being redirected to the Office of the Inspector General given that the office is responsible for investigating nonjudicial employees.  Silver and Reo refused to answer.

316.    In numerous communications from November 6, 2017, to January 16, 2018, Plaintiff asked questions, expressed concerns, and raised objections about the role, jurisdiction, independence, practices, and conduct of the court system's Inspector General.  Neither Porter, DiFiore, Marks, Silver, Reo, DeSole, McConnell, nor Evans responded to any of these questions, concerns, or objections.

317.    By the time Porter contacted Plaintiff, Plaintiff had been out of work for approximately three weeks.

318.    Porter first contacted Plaintiff on Wednesday, November 8, 2017.  She left a voicemail on Plaintiff's personal cell phone but did not state the purpose of her call or identify herself as the Managing Inspector General for Bias Matters.

319.    Plaintiff emailed Porter to ask for a clarification.

320.    In a series of terse emails, Porter identified herself, stated that she was in possession of the October 20 Letter, and asked Plaintiff to come in for an immediate interview as part of a "potential investigation."

321.    Porter refused to communicate further in writing.  She would not discuss the complaint process beyond referring Plaintiff to the court system's policies and website.  She repeatedly insisted that an immediate in-person interview was the only way to proceed with Plaintiff's complaints.

322.    Plaintiff requested to document the complaint process in writing.

323.    Porter refused and requested an interview.

324.    Plaintiff again requested to document the complaint process in writing.

325.    Porter again refused and requested an interview.

326.    Plaintiff cited the court system's policies and noted that she had not filed a formal complaint with Porter's office.

327.    Porter asked Plaintiff to confirm that she was not interested in pursuing a complaint against Hoffman.

328.    Plaintiff replied that she could not confirm and objected to manner in which Porter's investigation was being initiated.

329.    Porter simply deleted Plaintiff's objection from the email chain.

330.    Over the next six weeks, Porter engaged in a bewildering pattern of conduct:  She refused to interact with Plaintiff in writing.  She refused to acknowledge or investigate any of Plaintiff's written complaints.  She refused to allow Plaintiff to document the complaint process.  She repeatedly tried to confirm that Plaintiff was not interested in pursuing complaints against Hoffman.  She repeatedly tried to cut off other complaint avenues pursued by Plaintiff.  She

repeatedly interfered with and attempted to divert communications Plaintiff directed to other court system officials.  She refused to respond to any of Plaintiff's numerous objections and concerns regarding any aspect of the complaint process.  She simply insisted, over and over, on interviewing Plaintiff in person.

331.    When Plaintiff asked for a copy of the complaint submitted to Porter's office, Porter did not respond.

332.    When Plaintiff asserted that Porter's office was being misused, Porter did not respond.

333.    When Plaintiff asked how, when, and what information Silver had referred to Porter's office, Porter refused to answer.

334.    When Plaintiff informed Porter that she had submitted an 11-page complaint alleging sex- and race-based harassment and discrimination by Hoffman, Porter did not respond.

335.    When Plaintiff invited Porter to investigate her 11-page complaint, Porter did not respond.

336.    When Plaintiff repeatedly objected to the absence of documentation in the court system's complaint process, Porter did not respond.

337.    When Plaintiff repeatedly offered to answer any of Porter's questions in writing, Porter did not respond.

338.    When Plaintiff noted that Porter had not pursued information from any other witnesses, including Hoffman, Scarpulla, and Silver, Porter did not respond.

339.    When Plaintiff asked why she had been transferred and demoted after submitting an 11-page complaint, Porter refused to answer.

340.     When Plaintiff asked Porter to identify the decision-makers responsible for reviewing Plaintiff's complaints, Porter refused to answer.

341.     On Wednesday, December 13, 2017, having received no response to any of her written complaints from anyone in the court system for approximately two months, Plaintiff escalated her complaints directly to Marks.

342.     Approximately two hours later, Evans, who had been unresponsive to Plaintiff's communications for weeks, suddenly informed Plaintiff, for the first time, that the Inspector General – presumably Porter – was actively investigating her complaints.

343.     Evans refused to provide any additional information.

344.     Marks did not respond.

345.     Two days later, on Friday, December 15, 2017, Plaintiff was fired without an explanation.

346.     Evans informed Plaintiff with a one-line email that the Inspector General's investigation had ended.  She refused to provide any additional information.

347.     Plaintiff was never notified of the outcome of Porter's investigation.  Plaintiff received no report, determination, verbal explanation, or any other kind of response pertaining to any investigation conducted by the court system's Inspector General.

348.     Defendants repeatedly refused to provide any reason or explanation for firing Plaintiff.

349.     Defendants never responded to any of Plaintiff's numerous, documented complaints, including her 11-page complaint alleging harassment, discrimination, and retaliation by Hoffman.

*Additional Allegations*

350.    The court system's Office of the Inspector General does not operate as an independent watchdog.  On information and belief, the office has been captured by individual judges and the court system's Counsel's Office.  The office has been misused, variously, to conduct politically motivated investigations; to force nonjudicial employees to resign; to suppress evidence of complaints; to facilitate willful blindness and shield administrators from information about complaints; and to prepare for litigation against complainants.

351.    Porter does not operate as an independent investigator.  She cannot, and does not, investigate judges.  She refuses to accept, acknowledge, or solicit written complaints.  She refuses to ask questions on the record.  She deletes communications from the record.  She refuses to question witnesses.

352.    Porter's office operates beyond any internal supervision or review.  Porter does not disclose her findings or reports.  Her jurisdiction, guidelines, and practices cannot be ascertained.  Her investigations cannot be monitored or appealed.  No one at the highest levels of the administration of the New York State court system was willing to discuss the jurisdiction or practices of the Office of the Inspector General on the record.

353.    The intended effects of channeling harassment and discrimination complaints against judges through Porter's office – and insisting that those complaints must be made orally and in person – include, but are not limited to: suppressing documentary evidence of complaints; denying complainants access to the record; and evading monitoring and legal review.

354.    Porter reports to Silver and cannot investigate Silver.  The intended effect of channeling a complaint against Silver through Porter's office is to suppress a complaint against Silver.

355.    Porter did not investigate Plaintiff's complaints.  On information and belief, Porter took no investigative action that could verify or corroborate any of Plaintiff's numerous, documented statements to various judges, lawyers, and administrators.

356.    In the course of handling Plaintiff's complaints, Porter made numerous fraudulent representations and/or omissions, and Plaintiff relied on those representations and/or omissions to her detriment, including but not limited to: that Porter had the authority and/or intent to investigate Plaintiff's complaints; that Porter could not accept complaints in writing, could not communicate with Plaintiff in writing, and could not investigate any of Plaintiff's written complaints; that the only procedure available for moving forward with Plaintiff's complaints was through an immediate, in-person interview with the Office of the Inspector General; that Silver had properly referred Plaintiff's complaints to the Office of the Inspector General; that Porter could not disclose how, when, and what information Silver had referred to the Office of the Inspector General; and that Porter investigated Plaintiff's complaints.

357.    Porter refused to perform the functions of the Managing Inspector General for Bias Matters of the New York State court system.

358.    Porter misused the authority of her public position and office to retaliate against Plaintiff and to assist others in retaliating against Plaintiff for opposing sex- and race-based harassment, discrimination, and retaliation.

359.    Porter supervised, failed to supervise, permitted, contributed to, and/or failed to remedy intentional and/or negligent torts and unlawful conduct committed against Plaintiff by Hoffman, Scarpulla, Silver, Marks, McConnell, DeSole, Evans, and Reo.

360.    Porter repeatedly ignored, failed to comply with, and refused to enforce the court system's sexual harassment and discrimination policies.

361.     Porter is professionally incompetent.  She repeatedly and intentionally violated numerous, widely known, and widely accepted standards and practices for handling sexual harassment and discrimination complaints and conducting sexual harassment and discrimination investigations.

362.     Porter intentionally violated multiple federal and state laws enumerated in Section VII of this Complaint, has a history and pattern of engaging in intentional retaliation against complaining employees, and is unfit to serve as the Managing Inspector General for Bias Matters for the New York State court system.

**Lauren DeSole**

363.     Lauren DeSole is the Director of Human Resources for the New York State court system.  In that capacity, DeSole oversees employment in a branch of state government with over 18,000 public employees.  Her specific responsibilities are unclear.  Neither DeSole nor the position of Director of Human Resources is listed on the court system's website.  In person, DeSole described herself as a union contract negotiator.  According to DeSole, she handles employee complaints "only when something special happens."

*Initial Conduct*

364.     By the time DeSole contacted Plaintiff, Plaintiff had been out of work for approximately three weeks; Hoffman had threatened to fire and hurt Plaintiff; Scarpulla, Silver and Reo had all cut contact with Plaintiff; and Porter had refused to communicate with Plaintiff in writing.

365.    On Thursday, November 9, 2017, DeSole contacted Plaintiff for the first time. She left a voicemail on Plaintiff's cell phone with her name and number and asked for a call back.

366.    Plaintiff emailed DeSole, explained that she wanted to document her interactions with the court system, and asked to communicate with DeSole over email.

367.    DeSole refused to communicate with Plaintiff in writing and repeatedly insisted on a phone call or in-person meeting.  She refused to state the purpose of the call or meeting. She refused to answer Plaintiff's basic employment questions in writing.

368.    On Friday, November 10, 2017, Plaintiff objected to DeSole's responses, insisted that DeSole immediately clarify Plaintiff's employment status in writing, requested that her personal items be removed from Hoffman's chambers, requested that the October 20 Letter be returned to Scarpulla and that all other copies be destroyed, and placed a litigation hold on Reo's office phone.

369.    In response, DeSole finally disclosed, after approximately 10 email communications, that Plaintiff was still actively employed by the court system.  She explained that she was now providing information in writing only because Plaintiff appeared to be experiencing distress.  She stated that an in-person meeting was not mandatory but expressed the view that written communication was not sufficiently interactive and not a productive way to communicate.  She described the purpose of an in-person meeting as: "providing you with options so you may return to work and set a path forward."

370.    DeSole and Plaintiff made arrangements for Plaintiff to contact and obtain advice from Plaintiff's union representative, Barbara Brown, Chair of the Citywide Association of Law Assistants.

371.    On Monday, November 13, 2017, Plaintiff sent two email updates to DeSole.  She informed DeSole that she believed she had a sex- and race-based discrimination claim against Hoffman, that she preferred to pursue that claim in the Equal Employment Opportunity Commission ("EEOC") because she lacked confidence in the court system's internal complaint process, and that she was eager to meet in person with DeSole in order to find a path forward within the court system.

372.    On Tuesday, November 14, 2017, DeSole lashed out at Plaintiff.  She asserted that she was not in a position to give Plaintiff instructions or advice, accused Plaintiff of being uncooperative, reminded Plaintiff that she was an at-will employee, and vaguely told Plaintiff that her options were becoming limited.

373.    On Wednesday, November 15, 2017, DeSole, Brown, and Plaintiff met in person for approximately two hours.

374.    Before the meeting, Brown cautioned Plaintiff against pursuing a complaint against Hoffman: "If you do this, no judge will want to hire you."  She told Plaintiff, "You have to choose between justice and your job."

375.    In the meeting, DeSole only discussed Plaintiff's complaints against Hoffman and did not address any of Plaintiff's other employment-related matters (e.g., transfer request, interview with Silver, inability to return to work).

376.    DeSole told Plaintiff that she would be fired within one week, on November 22, 2017, unless she provided information to support her claims against Hoffman.

377.    DeSole repeatedly encouraged Plaintiff to resign.  She told Plaintiff that she was young, that this was the beginning of her career, that she could get a job elsewhere, that she was

never meant to work in the court system permanently, and that she was always meant to leave. She told Plaintiff that she would provide her with references if she chose to resign.

378.    DeSole repeatedly discouraged Plaintiff from pursuing a complaint against Hoffman.  She told Plaintiff that even if her claims against Hoffman were substantiated it was unlikely that she would be reassigned to a principal court attorney position.  She refused to discuss the possible outcomes of pursuing an internal complaint against Hoffman but suggested that the court system would reject any complaint short of physical assault, saying only: "If it's a Harvey Weinstein situation, then maybe yeah…"  She immediately pushed back on Plaintiff's factual assertions.  She previewed legal counterarguments by McConnell.  She repeatedly emphasized that Plaintiff was an at-will employee.  She said, "You don't want to be a plaintiff."

379.    Plaintiff informed DeSole that she would submit information to support her claims against Hoffman by November 22, 2017.

### November 22 Complaint

380.    On Wednesday, November 22, 2017, Plaintiff submitted an 11-page written complaint to DeSole.

381.    Plaintiff's complaint included detailed allegations supporting claims of sex- and race-based harassment, sex- and race-based discrimination, sex- and race-based stereotyping, and retaliation by Hoffman.  Plaintiff's complaint also suggested retaliation by Scarpulla and Silver.

382.    In response, DeSole informed Plaintiff that she would continue to be employed by the court system "while we review the document."  She said she would speak with her "principals" and provide Plaintiff with further instructions.

383.    On Friday, November 24, 2017, DeSole demoted Plaintiff.

384.    DeSole instructed Plaintiff to report to work in what she characterized as a temporary assignment in the Brooklyn law department, a pool position located in a different borough.

385.    DeSole provided no additional information about the status or handling of Plaintiff's complaint.  She told Plaintiff that she would be out of the office and that she would "check in" with Plaintiff by December 1, 2017.

386.    On Saturday, November 25, 2017, Plaintiff objected to the assignment in Brooklyn as retaliatory and requested additional information.

387.    DeSole again instructed Plaintiff to report to work in Brooklyn and stated that she was forwarding Plaintiff's inquiries "to Counsel."  She refused to identify her "principals," refused to explain why Plaintiff was being assigned to Brooklyn, and refused to provide any additional information.

388.    DeSole then cut contact with Plaintiff.

389.    DeSole did not check in with Plaintiff on December 1, 2017.

390.    Plaintiff worked in the Brooklyn law department for approximately three weeks without any additional explanation or information.  Evans instructed Plaintiff not to communicate about her complaints, or any other topic, with anyone else in the entire court system, and refused to clarify the instruction.

391.    During this period, DeSole, Porter, and Evans repeatedly refused to respond to Plaintiff's communications, repeatedly refused to explain why Plaintiff had been assigned to Brooklyn, repeatedly refused to explain how Plaintiff's complaints were being handled, and repeatedly refused to identify the "principals" who were handling Plaintiff's complaints.

392.    Plaintiff's new supervisor was not provided with any information.  He told Plaintiff that he did not know how long her assignment in the Brooklyn law department would last: "It could be three days or three years."

393.    On Wednesday, December 13, 2017, Plaintiff escalated her complaints directly to Marks and objected to the manner in which her harassment, discrimination, and retaliation complaints and employment matters were being handled by the court system.

394.    Marks did not respond.

395.    Two days later, on Friday, December 15, 2017, DeSole informed Plaintiff that she was fired.

396.    DeSole did not provide any additional explanation or information.

397.    Defendants repeatedly refused to provide a reason for firing Plaintiff.

398.    Neither DeSole, nor any of the named Defendants, responded to any of Plaintiff's numerous oppositions and complaints, including her 11-page complaint alleging harassment, discrimination, and retaliation by Hoffman.

### *Additional Allegations*

399.    When Plaintiff requested to document her communications with the court system, DeSole refused, arranged an in-person meeting under false pretenses, and attempted to solicit Plaintiff's complaints orally.

400.    Despite Plaintiff's numerous objections to the absence of documentation, neither DeSole nor any of the named Defendants presented Plaintiff with an option to submit a written complaint.  From November 2, 2017, to December 11, 2017, Plaintiff objected to the absence of documentation in the court system's complaint process approximately 10 times.  DeSole and Porter repeatedly solicited and pressured Plaintiff to make her complaints orally and in person.

401.    When Plaintiff submitted a written complaint to DeSole, DeSole demoted Plaintiff, cut contact with Plaintiff, and disappeared.

402.    DeSole refused to perform the functions of her position as Director of Human Resources of the New York State court system.  She refused to address Plaintiff's employment-related matters (e.g., transfer request, interview with Silver, inability to return to work).  She refused to separate Plaintiff's employment-related matters from her harassment, discrimination, and retaliation complaints.  She made all of Plaintiff's employment-related matters contingent on whether, when, and how Plaintiff pursued complaints against Hoffman.

403.    On November 15, 2017, nearly one month after Plaintiff first reported Hoffman's conduct, DeSole stated that Hoffman had not been informed of Plaintiff's complaints and asserted that it was not useful to speak to Hoffman at that time: "If I called Judge Hoffman right now, he would just say he didn't do it."

404.    DeSole stated that Silver and Scarpulla had not reported any additional information in connection with Plaintiff's complaints: "They have no idea what you're talking about."

405.    When Plaintiff asked directly whether Hoffman, Scarpulla, or Silver would be questioned in connection with her complaints, DeSole was silent and refused to answer.

406.    DeSole denied that Hoffman had attempted to fire another law clerk in the week of October 23, 2017; asserted that Reo had simply been "confused" in his email communications with Plaintiff; suggested that Plaintiff had remained with Scarpulla for five years because Plaintiff could not find a job elsewhere; expressed surprise that Plaintiff had interviewed for the position with Hoffman; and made repeated and gratuitous references to Plaintiff's "family," "domestic partner," and "husband."

407.    DeSole noted that Plaintiff appeared to be experiencing "distress" and stated that she had been "disturbed" while reading the October 20 Letter to Scarpulla.

408.    According to DeSole, repeated written reports that a judge has threatened to fire a law clerk, threatened to hurt a law clerk, and has repeatedly demanded the law clerk's silence as a condition of her continued employment, coupled with allegations that the judge has repeatedly engaged in unprofessional conduct, is an insufficient basis for the court system to intervene on behalf of the law clerk, transfer the law clerk, or question the judge.

409.    In the course of handling Plaintiff's complaints, DeSole made numerous fraudulent representations and/or omissions, and Plaintiff relied on those representations and/or omissions to her detriment, including but not limited to: that DeSole intended to assist Plaintiff; that the purpose of meeting with DeSole in person was to address Plaintiff's employment-related matters and concerns and set a path forward for Plaintiff within the court system; that Plaintiff had the option of pursuing complaints against Hoffman through the court system's Human Resources Department; that the court system would respond to Plaintiff's 11-page complaint against Hoffman; and that DeSole would follow up with Plaintiff on December 1, 2017.

410.    DeSole misused the authority of her public position and office to retaliate against Plaintiff and to assist others in retaliating against Plaintiff for opposing sex- and race-based harassment, discrimination, and retaliation.

411.    DeSole supervised, failed to supervise, permitted, contributed to, and/or failed to remedy intentional and/or negligent torts and unlawful conduct committed against Plaintiff by Hoffman, Scarpulla, Silver, Marks, McConnell, Porter, Evans, and Reo.

412.    DeSole repeatedly ignored, failed to comply with, and refused to enforce the court system's sexual harassment and discrimination policies.

413.    DeSole is professionally incompetent.  She repeatedly and intentionally violated numerous, widely known, and widely accepted standards and practices for handling sexual harassment and discrimination complaints.  It is unclear what functions DeSole performs in her role as Director of Human Resources.

414.    DeSole intentionally violated multiple federal and state laws enumerated in Section VII of this Complaint and is unfit to serve as the Director of Human Resources of the New York State court system.

### Lisa Evans

*Summary*

415.    Lisa Evans is Assistant Deputy Counsel to the New York Court System.  Her responsibilities include defending individual judges and the court system against sexual harassment, discrimination, and retaliation claims.  Evans reports to McConnell and Marks.

416.    By the time Evans contacted Plaintiff, Hoffman had threatened to fire and hurt Plaintiff; Scarpulla, Silver, and Reo had all cut contact with Plaintiff; Plaintiff had been out of work for approximately five weeks; Plaintiff had submitted an 11-page complaint to DeSole; DeSole had demoted and cut contact with Plaintiff; and Plaintiff had started working in the Brooklyn law department without any information about the status of her complaints, how her complaints were being handled, or the identity of the individuals who were handling her complaints.

417.    Evans first contacted Plaintiff on Wednesday, November 29, 2017.

418.    Evans took control of the entire complaint process, instructed Plaintiff not to talk to anyone else, and began sending Plaintiff unresponsive letters by mail on court system letterhead.

419.    Evans repeatedly refused to respond to any of Plaintiff's questions, objections, or complaints.

420.    Between November 29, 2017, and December 15, 2017, Evans was directly addressed, copied on, and/or received on her work email account at least 13 separate written communications related to Plaintiff's complaints and employment-related matters.

421.    Evans either ignored these communications entirely or replied by mail with terse, unresponsive letters.

422.    For example, on December 5, 2017, in response to a three-page email summarizing Plaintiff's questions, objections, and employment situation, Evans sent a three-line letter instructing Plaintiff not to talk to anyone else in the entire court system about any topic. Evans refused to clarify the instruction.

423.    Evans refused to disclose why Plaintiff had been assigned to the Brooklyn law department or how long she would be there.

424.    Evans refused to acknowledge that Plaintiff had submitted an 11-page complaint alleging harassment, discrimination, and retaliation by Hoffman.

425.    Evans refused to identify the individuals who were handling Plaintiff's complaints and employment-related matters.

426.    Evans refused to acknowledge communications describing Plaintiff as experiencing extreme distress; describing retaliation by Scarpulla, Silver, and DeSole; describing a complete breakdown in the court system's internal complaint process; requesting that Plaintiff

59

be put on leave; requesting the appointment of an outside investigator; and requesting that the court system comply with basic standards and practices for handling harassment complaints.

427.    Evans refused to escalate or refer Plaintiff's complaints to any court official with the authority or ability to respond.

428.    Evans refused to communicate by email.

429.    Evans continued sending unresponsive letters by mail.

430.    The intended effect of Evans's conduct was to obstruct, delay, and suppress Plaintiff's complaints; to sever all contact between Plaintiff and the court system; to further isolate, demoralize, and exert pressure on Plaintiff; to disrupt Plaintiff's efforts to document the complaint process; and to deprive Plaintiff of any information about the handling of her complaints or employment-related matters.

431.    Plaintiff worked in isolation in Brooklyn for approximately three weeks without any additional explanation or information.

432.    On Wednesday, December 13, 2017, having received no response to any of her complaints from anyone in the court system for approximately two months, Plaintiff escalated her complaints directly to Marks.

433.    Approximately two hours later, Evans used her email account for the first time and sent Plaintiff a four-line response informing Plaintiff, for the first time, that her harassment and discrimination complaints were "actively being investigated" by the Office of the Inspector General and that, once the investigation was complete, Plaintiff would be informed of the outcome.

434.    Evans refused to respond to any follow-up communications.

435.    Marks did not respond.

436.    Two days later, on Friday, December 15, 2017, Evans forwarded a letter by DeSole informing Plaintiff that she was fired.

437.    In a one-line email, Evans stated that the Inspector General's investigation had ended.  She did not disclose the outcome of the investigation and repeatedly refused to provide a reason or explanation for Plaintiff's termination.

438.    Neither Evans, nor any of the named Defendants, responded to any of Plaintiff's numerous oppositions and complaints, including her 11-page complaint alleging harassment, discrimination, and retaliation by Hoffman.

***Additional Allegations***

439.    Evans refused to perform the functions of her position as Assistant Deputy Counsel.  She refused to act as an attorney.  She refused to communicate on behalf of the court system.  She refused to acknowledge and/or implement litigation holds.  She refused to observe document designation requests.  She took no legal positions on any issue.  She stated no objections on any issue.

440.    For approximately three weeks, Evans intentionally severed Plaintiff's relationship and communications with the court system.

441.    For approximately three weeks, Evans sent unresponsive letters by mail with the specific purpose of delaying Plaintiff's communications, fragmenting the documentary and evidentiary record, obstructing internal review and oversight, and preventing Plaintiff from escalating or forwarding her complaints.  Once Plaintiff was fired, Evans stopped sending letters and began using her email account to communicate.

442.    Evans repeatedly refused to state whether she was being supervised by McConnell.

443.    In the course of handling Plaintiff's complaints, Evans made several fraudulent representations and/or omissions, and Plaintiff relied on those representations and/or omissions to her detriment, including but not limited to: that the Office of the Inspector General was investigating Plaintiff's complaints; that the Office of the Inspector General had the authority and jurisdiction to investigate Plaintiff's complaints; and that Plaintiff would be informed of the outcome of the Inspector General's investigation once that investigation was complete.

444.    Evans misused the authority of her public position and office to retaliate against Plaintiff and to assist others in retaliating against Plaintiff for opposing sex- and race-based harassment, discrimination, and retaliation.

445.    Evans supervised, failed to supervise, permitted, contributed to, and/or failed to remedy intentional and/or negligent torts and unlawful conduct committed against Plaintiff by Hoffman, Scarpulla, Silver, Marks, McConnell, DeSole, Porter, and Reo.

446.    Evans repeatedly ignored, failed to comply with, and refused to enforce the court system's sexual harassment and discrimination policies.

447.    Evans is professionally incompetent.  She repeatedly and intentionally violated numerous, widely known, and widely accepted standards and practices for handling sexual harassment and discrimination complaints.  Evans appears to be incapable of performing basic legal functions or acting as an attorney.

448.    Evans intentionally violated multiple federal and state laws enumerated in Section VII of this Complaint and is unfit to serve as Assistant Deputy Counsel to the New York State court system.

## John McConnell

449.    John McConnell is Counsel to the New York State court system.  His responsibilities include defending individual judges and the court system against sexual harassment, discrimination, and retaliation claims.  His office is also responsible for drafting the administrative and procedural rules affecting the court system, as well as advising judges on the application of the Rules of Judicial Conduct.  McConnell reports to Marks.

450.    On information and belief, McConnell was one of the unidentified "principals" who directly handled, managed, and made decisions related to Plaintiff's complaints.

451.    Evans, DeSole, and Porter acted under the direction and supervision of one or more unidentified principals.  DeSole stated that she and Porter had been "asked" to handle Plaintiff's case, repeatedly referred to her "principals," stated that she needed to consult her "principals" for high level decisions, and stated that multiple unidentified people were reviewing Plaintiff's complaints.  Evans repeatedly said that she had been "assigned" to Plaintiff's case and said that documents were being "given" to her.

452.    Evans, DeSole, and Porter repeatedly refused to identify the individuals or "principals" who were handling Plaintiff's complaints.

453.    On information and belief, McConnell directed and coordinated the actions of Evans, DeSole, and Porter while repeatedly refusing to identify himself.  On November 15, 2017, DeSole told Plaintiff that she was in communication with McConnell and previewed some of McConnell's legal arguments.  She later referred questions related to the handling of Plaintiff's complaints to McConnell, who refused to respond and directed Porter and Evans to respond instead.  When asked, Evans, who reports directly to McConnell, repeatedly refused to state whether she was being supervised by McConnell.

454.    McConnell was directly addressed, copied on, and/or received on his work email account at least 19 written communications related to Plaintiff's complaints and employment matters.  For example, on December 13, 2017, McConnell received numerous communications describing in detail and with specificity how Plaintiff's complaints were being mishandled by Evans, DeSole, Porter, and Silver.

455.    McConnell responded to none of these communication except one, a December 21, 2017, email to DiFiore regarding changes to the court system's sexual harassment policy. McConnell's reply, written on behalf of DiFiore, asserted that Plaintiff had been fired and that, in light of Plaintiff's firing and "announced intention to litigate," DiFiore would not respond to Plaintiff or discuss the court system's sexual harassment policy outside of court.

456.    McConnell was repeatedly informed that Plaintiff had been fired without any explanation or response on the part of the court system after submitting an 11-page harassment, discrimination, and retaliation complaint against Hoffman.

457.    McConnell repeatedly refused to supervise and review the handling of Plaintiff's complaints.

458.    McConnell ratified the court system's response to Plaintiff's harassment, discrimination, and retaliation complaints.

459.    McConnell repeatedly attempted to prevent Plaintiff from escalating her complaints.  On information and belief, McConnell has a history and pattern of practice of preventing harassment, discrimination, and/or retaliation complaints from reaching administrative judges and decision-makers within the court system.

460.    On information and belief, McConnell has a history and pattern of practice of retaliating, suppressing, and mishandling harassment, discrimination, and/or retaliation complaints on behalf of the court system.

461.    On information and belief, McConnell is chiefly responsible for drafting the revision to the court system's sexual harassment policy described in Section V of this Complaint.

462.    McConnell refused to perform the functions of Counsel to the New York State court system.

463.    McConnell misused the authority of his public position and office to retaliate against Plaintiff and to assist others in retaliating against Plaintiff for opposing sex- and race-based harassment, discrimination, and retaliation.

464.    McConnell supervised, failed to supervise, permitted, contributed to, and/or failed to remedy intentional and/or negligent torts and unlawful conduct committed against Plaintiff by Hoffman, Scarpulla, Silver, Marks, DeSole, Porter, Evans, and Reo.

465.    McConnell repeatedly ignored, failed to comply with, and refused to enforce the court system's sexual harassment and discrimination policies.

466.    McConnell is professionally incompetent.  He was ideally positioned to prevent this litigation yet he intentionally precipitated it.  He coordinated the court system's response to Plaintiff's complaints but refused to identify himself and refused to respond to Plaintiff's communications.  In his sole correspondence with Plaintiff, McConnell openly cited, in writing, a retaliatory motive as the sole reason for DiFiore's refusal to communicate with Plaintiff.

467.    McConnell intentionally violated multiple federal and state laws enumerated in Section VII of this Complaint and is unfit to serve as Counsel to the New York State court system.

**Lawrence Marks**

468.    Lawrence Marks is the Chief Administrative Judge of the New York State court system.  He oversees the day-to-day administration and operation of the entire New York State court system.  Marks has been a New York State judge since approximately 2009.

469.    Marks is responsible for a wide array of administrative functions enumerated in the New York State Constitution, the New York Judiciary Law, as well as the administrative rules, regulations, and policies of the court system.  Most broadly, Article VI § 28(b) of the New York State Constitution states that Marks "shall supervise the administration and operation of the unified court system."

470.    Marks's specific duties include, but are not limited to, enforcing the state-wide policies and standards of the New York State court system, 22 N.Y. Comp. Codes R. & Regs. § 80.1(b)(5); operating the Office of Court Administration and supervising its personnel, including DeSole, Porter, Evans, and McConnell, § 80.1(b)(8); supervising Silver in his capacity as Deputy Chief Administrative Judge, § 80.2(a)(1); appointing and removing various nonjudicial personnel, including attorneys in the court system's law departments, § 80.1(b)(3); and approving transfers of nonjudicial employees, § 25.26(b)(6).

471.    In addition, under the court system's sexual harassment and discrimination policies, Marks is responsible for adjudicating appeals of administrative determinations made by the Deputy Chief Administrative Judge (Silver) pursuant to the internal investigations conducted by the Managing Inspector General for Bias Matters (Porter).  *See, e.g., Sexual Harassment Policy and Procedure* 11 (2016) (effective through Nov. 2017) (Ex. A).

472.    Plaintiff first contacted Marks on December 13, 2017, and objected to the manner in which her harassment, discrimination, and retaliation complaints and employment matters were being handled by the court system.

473.    Marks did not respond.

474.    Two days later, on December 15, 2017, Plaintiff was fired.

475.    On information and belief, Marks was one of the unidentified "principals" who directly handled, managed, and made decisions related to Plaintiff's complaints.

476.    Evans, DeSole, and Porter acted under the direction and supervision of one or more unidentified principals.  DeSole stated that she and Porter had been "asked" to handle Plaintiff's case, repeatedly referred to her "principals," stated that she needed to consult her "principals" for high level decisions, and stated that multiple unidentified people were reviewing Plaintiff's complaints.  Evans repeatedly said that she had been "assigned" to Plaintiff's case and said that documents were being "given" to her.

477.    Evans, DeSole, and Porter repeatedly refused to identify the individuals or "principals" who were handling Plaintiff's complaints.

478.    On November 15, 2017, DeSole told Plaintiff that Marks would personally review her complaints against Hoffman.  Once Plaintiff submitted an 11-page harassment, discrimination, and retaliation complaint against Hoffman, DeSole refused to identify Marks, or anyone else, as a decision-maker.

479.    On approximately November 24, 2017, Marks made and/or approved the decision to demote and transfer Plaintiff to the Brooklyn law department.  Neither McConnell, DeSole, Evans, nor Porter have the authority to transfer Plaintiff from a position as Hoffman's principal court attorney to a position in the Brooklyn law department without Marks's approval.

480.     On approximately December 15, 2017, Marks made and/or approved the decision to fire Plaintiff.  Neither McConnell, DeSole, Evans, nor Porter have the authority to fire Plaintiff without Marks's approval.

481.     Between December 13, 2017, and January 22, 2017, Marks was directly addressed, copied on, and/or received on his work email account at least 20 written communications related to Plaintiff's complaints and employment matters.  For example, on December 13, 2017, Marks received numerous communications describing in detail and with specificity how Plaintiff's complaints were being mishandled by Evans, DeSole, Porter, and Silver.

482.     Marks refused to respond to any of these communications.

483.     Marks was repeatedly informed that Plaintiff had been fired without any explanation or response on the part of the court system after submitting an 11-page harassment, discrimination, and retaliation complaint against Hoffman.

484.     Marks repeatedly refused to supervise and review the handling of Plaintiff's complaints.

485.     Marks ratified the court system's response to Plaintiff's harassment, discrimination, and retaliation complaints.

486.     On approximately December 1, 2017, while handling Plaintiff's complaints, Marks promulgated a revision to the court system's official sexual harassment policy.  Nearly all of the changes to the policy were deletions.  In total, Marks deleted approximately half of the court system's state-wide sexual harassment policy.  The revisions were made approximately nine days after Plaintiff submitted an 11-page complaint supporting claims for sex-based harassment, discrimination, and retaliation by Hoffman.  *See infra* Section V.

487.    All of the revisions to the court system's sexual harassment policy were related either to the substance of Plaintiff's complaints or to the manner in which Plaintiff reported or pursued her complaints.  On information and belief, Marks revised the court system's state-wide sexual harassment policy directly in response to Plaintiff's complaints.

488.    On information and belief, Marks revised the court system's state-wide sexual harassment policy in secret, unilaterally, without process, without input from employees, and without the benefit of adequate internal or external expertise.  Marks lacks the authority to unilaterally revise the court system's state-wide sexual harassment policy and did so in violation of Article VI § 28(c) of the New York State constitution and in violation of § 211(1)-(2) of the New York Judiciary Law.

489.    Marks refused to perform the functions of the Chief Administrative Judge of the New York State court system.

490.    Marks misused the authority of his public position and office to retaliate against Plaintiff and to assist others in retaliating against Plaintiff for opposing sex- and race-based harassment, discrimination, and retaliation.

491.    Marks supervised, failed to supervise, permitted, contributed to, and/or failed to remedy intentional and/or negligent torts and unlawful conduct committed against Plaintiff by Hoffman, Scarpulla, Silver, DiFiore, McConnell, DeSole, Porter, Evans, Reo, Fahey, Feinman, Garcia, Rivera, Stein, and Wilson.

492.    Marks repeatedly ignored, failed to comply with, and refused to enforce the court system's sexual harassment and discrimination policies.

493.    Marks is professionally incompetent.  He refused to respond to communications by a law clerk who alleged that she had been fired without a response after submitting written

sex- and race-based harassment and discrimination complaints against a judge.  He unilaterally and in secret deleted nearly half of the court system's sexual harassment policy – including all references to law – in the midst of broad, national attention to the problem of sex-based harassment in the workplace.  On information and belief, Marks is the only government official in the entire country to make comparable changes to the sexual harassment policy of an entire branch of government within this past year.

494.    Marks intentionally violated multiple federal and state laws enumerated in Section VII of this Complaint and is unfit to serve as the Chief Administrative Judge of the New York State court system.

## Janet DiFiore

495.    Janet DiFiore is the Chief Judge of the State of New York.  In that position, DiFiore serves as both the Chief Judicial Officer of New York State and as the Chief Judge of the Court of Appeals.  Her responsibilities are enumerated in the New York State Constitution, the New York Judiciary Law, and the administrative rules, regulations, and policies of the court system.

496.    Under Article VI § 28(c) of the New York State Constitution, DiFiore is responsible for establishing the court system's state-wide standards and administrative policies, subject to consultation with the court system's Administrative Board and the approval of the Court of Appeals.  Under Article VI § 28(a), DiFiore is responsible for supervising Marks in his capacity as Chief Administrative Judge.

497.    Between December 21, 2017, and March 7, 2018, DiFiore was directly addressed, copied on, and/or received on her work email account at least 11 written communications related to Plaintiff's complaints and employment matters.

70

498.    DiFiore refused to respond to any of these communications.

499.    DiFiore was repeatedly informed that Plaintiff had been fired without any explanation or response on the part of the court system after submitting an 11-page harassment, discrimination, and retaliation complaint against Hoffman.

500.    DiFiore was repeatedly asked, and repeatedly refused, to review and supervise the handling of Plaintiff's complaints.

501.    DiFiore was repeatedly asked, and repeatedly refused, to review and supervise the conduct of Marks and McConnell specifically.

502.    DiFiore was repeatedly informed about systemic problems in the court system's internal complaint process.

503.    DiFiore was repeatedly asked about the revision to the court system's state-wide sexual harassment policy and was repeatedly informed that nearly half of the court system's sexual harassment policy had been deleted.  *See infra* Section V.  It is unclear whether DiFiore was aware of the revision, whether she approved the revision, whether she consulted the court system's Administrative Board, whether she submitted the revised sexual harassment policy to the Court of Appeals for approval, or whether she otherwise complied with Article VI § 28(c) of the New York State Constitution.  DiFiore refused to answer any questions related to the court system's sexual harassment policy.

504.    On December 22, 2017, McConnell responded to an email addressed to DiFiore describing and opposing the revision to the court system's sexual harassment policy. McConnell's reply, written on behalf of DiFiore, asserted that Plaintiff had been fired and that, in light of Plaintiff's firing and "announced intention to litigate," DiFiore would not respond to Plaintiff or discuss the court system's sexual harassment policy outside of court.

505.    DiFiore was made aware of McConnell's response.

506.    On February 13, 2018, John Asiello, Chief Clerk and legal counsel to the Court of Appeals, responded to an email addressed to the members of the Court of Appeals regarding the court system's response to Plaintiff's harassment, discrimination, and retaliation complaints and the revision to the court system's sexual harassment policy.  Asiello's reply, written on behalf of the members of the Court of Appeals including DiFiore, cited, absurdly, to Rule 500.1[n] of the Court of Appeals' Rules of Practice and stated that any further attempts to contact DiFiore and the members of the Court of Appeals directly "would be improper."  Asiello's response was intentionally irrational.

507.    DiFiore was made aware of Asiello's response.

508.    DiFiore ratified the court system's response to Plaintiff's harassment, discrimination, and retaliation complaints.

509.    DiFiore refused to perform the functions of the Chief Judge of the State of New York.

510.    DiFiore misused the authority of her public position and office to retaliate against Plaintiff and to assist others in retaliating against Plaintiff for opposing sex- and race-based harassment, discrimination, and retaliation.

511.    DiFiore supervised, failed to supervise, permitted, contributed to, and/or failed to remedy intentional and/or negligent torts and unlawful conduct committed against Plaintiff by Hoffman, Scarpulla, Silver, Marks, McConnell, DeSole, Porter, Evans, Reo, Fahey, Feinman, Garcia, Rivera, Stein, and Wilson.

512.    DiFiore repeatedly ignored, failed to comply with, and refused to enforce the court system's sexual harassment and discrimination policies.

513.    DiFiore is professionally incompetent.  She refused to respond to communications alleging that a law clerk had been fired without any explanation or response on the part of the court system after submitting a sex- and race-based harassment, discrimination, and retaliation complaint against a judge.  She refused to respond to communications alleging legal violations by the court system's Chief Administrative Judge and the court system's Counsel.  She refused to respond to communications describing systemic failures in the court system's internal bias complaint process.  She approved and/or retroactively ratified a retaliatory deletion of nearly half of the court system's sexual harassment policy in the midst of broad, national attention to the problem of sex-based harassment in the workplace.  She was unwilling to publicly defend the court system's revised sexual harassment policy yet allowed it to persist and continue affecting over 18,000 state employees.

514.    DiFiore intentionally violated multiple federal and state laws enumerated in Section VII of this Complaint and is unfit to serve as the Chief Judge of the State of New York.

## Eugene Fahey, Paul Feinman, Michael Garcia, Jenny Rivera, Leslie Stein, and Rowan Wilson

515.    Eugene Fahey, Paul Feinman, Michael Garcia, Jenny Rivera, Leslie Stein, and Rowan Wilson ("Fahey et al.") are Associate Judges on the Court of Appeals, New York State's highest court.  Under Article VI § 28(c) of the New York State Constitution, Fahey et al. are responsible for reviewing and approving the court system's state-wide standards and administrative policies.

516.    Between January 22, 2018, and March 7, 2018, Fahey et al. were directly addressed, copied on, and/or received on their work email accounts at least 6 separate written communications related to Plaintiff's complaints and employment matters.

517.    Fahey et al. refused to respond to any of these communications.

518.    Fahey et al. were repeatedly informed that Plaintiff had been fired without any explanation or response on the part of the court system after submitting an 11-page harassment, discrimination, and retaliation complaint against a sitting judge.

519.    Fahey et al. were repeatedly asked, and repeatedly refused, to review and supervise the handling of Plaintiff's complaints.

520.    Fahey et al. were repeatedly asked, and repeatedly refused, to review and supervise the conduct of DiFiore and Marks.

521.    Fahey et al. were repeatedly informed about systemic problems in the court system's internal complaint process.

522.    Fahey et al. were repeatedly asked about the revision to the court system's state-wide sexual harassment policy and were repeatedly informed that nearly half of the court system's sexual harassment policy had been deleted.  *See infra* Section V.  It is unclear whether Fahey et al. were aware of the revision, whether they had reviewed the revision, whether they had approved the revision, or whether they otherwise complied with and fulfilled their duties under Article VI § 28(c) of the New York Constitution.  Fahey et al. refused to answer any questions related to the court system's sexual harassment policy.

523.    On February 13, 2018, John Asiello, Chief Clerk and legal counsel to the Court of Appeals, responded to an email addressed to Fahey et al. regarding the court system's response to Plaintiff's harassment, discrimination, and retaliation complaints and the revision to the court system's sexual harassment policy.  Asiello's reply, written on behalf of Fahey et al., cited, absurdly, to Rule 500.1[n] of the Court of Appeals' Rules of Practice and stated that any further

attempts to contact Fahey et al. directly "would be improper."  Asiello's response was intentionally irrational.

524.    Fahey et al. were made aware of Asiello's response.

525.    Fahey et al. ratified the court system's response to Plaintiff's harassment, discrimination, and retaliation complaints.

526.    Fahey et al. refused to perform the functions of Associate Judges of the New York Court of Appeals.

527.    Fahey et al. misused the authority of their public positions and offices to retaliate against Plaintiff and to assist others in retaliating against Plaintiff for opposing sex- and race-based harassment, discrimination, and retaliation.

528.    Fahey et al. supervised, failed to supervise, permitted, contributed to, and/or failed to remedy intentional and/or negligent torts and unlawful conduct committed against Plaintiff by Hoffman, Scarpulla, Silver, Marks, DiFiore, McConnell, DeSole, Porter, Evans, and Reo.

529.    Fahey et al. repeatedly ignored, failed to comply with, and refused to enforce the court system's sexual harassment and discrimination policies.

530.    Fahey et al. intentionally violated multiple federal and state laws enumerated in Section VII of this Complaint and are unfit to serve as Associate Judges on the New York Court of Appeals.

**Lori Sattler**

531.    Lori Sattler is an elected Justice serving in the Matrimonial Division of New York Supreme Court.  She has been a New York State judge since approximately 2007.

532.    Sattler was supervised by Hoffman in Family Court.

533.   Sattler knew that Hoffman had a history and habit of harassing subordinate female employees, mistreating subordinate female employees, and employing female government attorneys as personal assistants and companions.

534.   In August and September 2017, Sattler fraudulently induced Plaintiff to accept the job as Hoffman's principal court attorney.  Through other judges, Sattler informed Plaintiff about the opening for Hoffman's principal court attorney position and lobbied aggressively for Plaintiff to accept the position.  She expressed a strong interest in Plaintiff accepting the position, urged that Plaintiff accept the position, and asked repeatedly whether Plaintiff was going to accept the position.

535.   Sattler told another court system employee that she was looking for someone "very nice" to become Hoffman's principal court attorney.

536.   On October 18, 2017, Hoffman threatened to fire Plaintiff, threatened to have her escorted from the building immediately, threatened to hurt her, and repeatedly demanded her silence as a condition of her continued employment.  On information and belief, Sattler was aware of, condoned, did not report, withheld information about, and did not intervene to stop Hoffman's conduct.

537.   In the week of October 23, 2017, Hoffman was involved in an altercation with another female law clerk.  Hoffman attempted to fire the law clerk, took away her keys, told her that she would not have a job, and angrily complained about the staff's "civil service mentality." He later instructed the law clerk to return to his chambers as if nothing had happened.  When the law clerk complained to Sattler about Hoffman, Sattler condoned, did not report, and did not intervene to stop Hoffman's conduct.  She pressured the law clerk to stay with Hoffman, saying, approximately: "He doesn't have anyone to answer the phone right now.  It's very hard on him."

538.     Sattler misused the authority of her public position and office to retaliate against Plaintiff or to assist others in retaliating against Plaintiff for opposing sex- and race-based harassment, discrimination, and retaliation.

539.     Sattler aided and abetted Hoffman's harassment, discrimination and retaliation.

540.     Sattler supervised, failed to supervise, permitted, failed to prevent, contributed to, and/or failed to remedy intentional and/or negligent torts and unlawful conduct committed against Plaintiff by Hoffman.

541.     Sattler repeatedly ignored, failed to comply with, and refused to enforce the court system's sexual harassment and discrimination policies.

542.     Sattler intentionally violated multiple federal and state laws enumerated in Section VII of this Complaint and is unfit to serve as a New York State judge.

## V.     RETALIATORY REVISION OF THE COURT SYSTEM'S SEXUAL HARASSMENT POLICY

543.     The New York State court system's Sexual Harassment Policy and Procedure applies to more than 18,000 public employees in over 300 locations across the state.

544.     The policy establishes standards of conduct, outlines remedial procedures, describes avenues of complaint, provides information and guidance to employees, and represents the court system's mission statement and commitment to addressing sexual harassment in the workplace.

545.     On approximately December 1, 2017 – nine days after Plaintiff submitted an 11-page complaint supporting claims for sex-based harassment, discrimination, and retaliation by Hoffman – Marks promulgated a revised sexual harassment policy.  *See Sexual Harassment Policy and Procedure* (2017) (Ex. B).

546.    All of the revisions to the court system's sexual harassment policy were related either to the substance of Plaintiff's complaints or to the manner in which Plaintiff reported or pursued her complaints.

547.    Nearly all of the revisions were deletions.  Numerous sections of the policy were deleted outright.  Other sections were reduced to a few vague sentences.  In total, Marks deleted approximately half of the court system's state-wide sexual harassment policy.

548.    The revision was not announced.  The existing policy was simply removed from the court system's website.  On December 1, 2017, Silver sent out a system-wide memo "to remind all members of the UCS community of our policy on sexual harassment."  The memo contained a link to the revised policy but no indication that the policy had changed.

549.    The revisions to the policy include, but are not limited to:

550.    All statements that sexual harassment is illegal were deleted.  All references to federal, state, and local law were deleted.  All instances of the words "law," "outlaw," "lawful," "legal," and "illegal" were deleted.  *Compare* Ex. A at 2, 3, 4, 13 *with* Ex. B.

551.    The full definition of workplace sexual harassment – as set forth in federal regulations, used by the EEOC, and cited in case law – was deleted.  It was replaced with an inaccurate and incomplete definition limited to hostile work environment harassment.  *Compare* Ex. A at 4 *with* Ex. B at 1; *see also* 29 C.F.R. § 1604.11(a) (2017).

552.    Examples of subtler forms of physical and non-physical harassment were deleted (e.g., putting an arm around a shoulder when work is reviewed; finding excuses to brush against someone; frequent inquiries about sexual or social life; attempts to turn work discussions to sexual topics; pressure for lunch, dinner, or social encounters; refusing to take seriously requests to stop unwanted behaviors).  *Compare* Ex. A at 4-5 *with* Ex. B at 1-2.

553.   Examples of overt physical harassment and assault were added (e.g., physical violence, sexual assault, patting, pinching, stroking, and fondling). *Id.*

554.   Duplicate examples of overt physical harassment were added for emphasis or as padding (e.g., physical contact, touching, and pinching). *See* Ex. B at 1.

555.   An entire section encouraging employees to come forward with complaints was deleted. *Compare* Ex. A at 14 ("I am not interested in causing trouble, either for myself or for the court system, but I don't like being harassed.  Is making a complaint the right thing to do?") *with* Ex. B (section deleted).

556.   Two entire sections on seeking help from supervisors were deleted.  All statements regarding supervisors' obligations – to implement and enforce the policy and to help employees subject to harassment – were deleted.  Statements encouraging employees to approach supervisors were deleted.  *Compare* Ex. A at 7-8 ("Is approaching my supervisor a good idea?" and "May I choose another supervisor or manager I think would be helpful and discuss the problem with him or her?") *with* Ex. B (sections deleted).

557.   An entire section encouraging employees to address sexual harassment early was deleted.  Statements explaining that harassment may become worse if it is not addressed and encouraging employees to act before harassment becomes severe enough to support a legal claim were deleted.  *Compare* Ex. A at 5 ("How bad must sexually harassing behavior be before I do something about it?") *with* Ex. B (section deleted).

558.   An entire section providing guidance for interacting with the harasser was deleted.  Advice on communicating directly with the harasser, describing the problematic behavior with specificity, and stating that the behavior is unwelcome was deleted.  Advice on using writing to communicate with the harasser was deleted.  Advice on the potential challenges of confronting

the harasser and the availability of other forms of help was deleted.  *Compare* Ex. A at 7 ("How do I let the harasser know that the behavior is unwelcome?") *with* Ex. B (section deleted).

559.     A statement recognizing that sexual harassment may be subtle or direct was deleted.  *Compare* Ex. A at 4 ("Sexually harassing behavior may be subtle or direct…") *with* Ex. B (statement deleted).

560.     All statements recognizing that sexual harassment may result in harmful employment-related consequences – e.g., the potential for sexual harassment to influence employment decisions, impact an employee's work life, or affect the employee's job performance – were deleted.  In general, the effects and relationship between sexual harassment and employment – i.e., the "workplace" component of workplace sexual harassment – were deemphasized throughout.  *Compare* Ex. A at 4, 13 *with* Ex. B at 1, 6.

561.     Statements advising employees to document the steps they have taken to stop harassment and what happens in response to complaints were deleted.  *Compare* Ex. A at 6-7 ("What kind of records should I keep and how will it help?") *with* Ex. B at 3.

562.     An entire section on retaliation was deleted and replaced with two sentences. For example, the following paragraphs were deleted:

> The laws and policies that outlaw sexual harassment also outlaw retaliation against people who report or make complaints about harassment.  Any harmful action affecting you as an employee that is taken because you have reported sexual harassment or any other kind of discrimination, either informally or through the formal complaint process, is absolutely forbidden.  It does not matter whether the action was taken by a supervisor or a co-worker, the person you complained about or someone else.  It is illegal.

> If you think that someone might retaliate against you – for example, that you might be fired, transferred, or evaluated unfairly if you complain – you should tell the person you first approach about your concerns.  If someone does retaliate, you should go immediately to a supervisor or manager, an Anti-Discrimination Panel member, or the Office of the Managing Inspector General For Bias Matters.  The

same process used for investigating discrimination charges will be used for
handling the retaliation complaint.

And replaced with:

The Unified Court System's policy is to protect employees against retaliation for
making a complaint.

*Compare* Ex. A at 13 ("I am afraid that if I complain I will be treated unfairly or even fired.  Do I

have any protection?") *with* Ex. B at 6 ("If I file a complaint, how do I know I will not be treated

unfairly?").

563.    Retaliation is not further defined in the revised policy.  A clear statement

that a complainant may receive a favorable determination on retaliation "even if the

Unified Court System decides your harassment complaint does not have merit" was

deleted.  *Id.*

564.    Multiple avenues of complaint, including all informal avenues of complaint,

appear to have been eliminated entirely.  The preface to the revised policy mentions "informal"

procedures but no such procedures are described within the policy itself.  *See* Ex. B at ii.  All

other uses of the word "informal" were deleted.  All uses of the words "option" and "options"

were deleted.  An entire section on the court system's Anti-Discrimination Panel program –

created to serve as a distinct avenue of complaint and a source of information and advice for

employees – was deleted.  *Compare* Ex. A at 8-9 ("How can the Unified Court System's Anti-

Discrimination Panels help me?") *with* Ex. B (section deleted).  Brief suggestions to approach

supervisors remain, but the revised policy provides no guidance to supervisors except to redirect

formal written complaints to the Office of the Inspector General.  *Compare* Ex. A at 5-9 *with* Ex.

B at 2-3.  A new mention of a Work-Safe Office was added, but that office is not described.  Ex.

B at 2.  From the court system's website, it appears that the Work-Safe Office deals primarily

with workplace safety and violence.  Its functions, procedures, and responsibilities are unclear,

and it seems to exist primarily to redirect complaints to other offices, presumably including to

the Office of the Inspector General.  *Work-Safe Office*, New York Courts,

https://www.nycourts.gov/ip/work-safe/index.shtml (last updated Nov. 28, 2017).  In short, under

the revised policy, all avenues of complaint, formal or informal, regardless of where they

originate, appear to lead to the Office of the Inspector General.

565.    Statements related to confidentiality, and the court system's commitment to

maintaining the confidentiality of complaining employees, were deleted.  *Compare* Ex. A at 12

("I want to keep this as quiet as possible.  Do I have a right to expect that my complaint will be

treated confidentially?") *with* Ex. B at 6.

566.    The phrase "On behalf of the court system…" was deleted from the introductory

preface signed by Marks.  *Compare* Ex. A at 2 *with* Ex. B at ii.

567.    On information and belief, the policy was revised unilaterally by Marks and

McConnell in secret, without any formal deliberative process, without notice, without comment,

and without the benefit of any internal or external expertise on workplace sexual harassment.

568.    On information and belief, the revised policy was promulgated unilaterally by

Marks without further oversight or approval.

569.    On information and belief, the revised policy was not approved by the New York

Court of Appeals.  N.Y. Const. art. VI, § 28(c) (promulgation of a state-wide administrative

policy in the judicial branch requires approval by the Court of Appeals).  All members of the

New York Court of Appeals refused to answer questions about the revision to the court system's

sexual harassment policy.  *See supra* Fahey et al.

570.    On information and belief, DiFiore did not consult with the court system's Administrative Board and did not submit the revised state-wide policy for approval by the Court of Appeals.  *See* N.Y. Const. art. VI, § 28(c).  DiFiore refused to answer questions regarding the policy and asserted, through McConnell, that the appropriate forum for discussion of the court system's sexual harassment policy was in court.  *See supra* Janet DiFiore.

571.    On information and belief, as of today, no court system official has either announced that the court system's state-wide sexual harassment policy has been revised or explained the nature of the revision.

572.    The revised policy document is marked "Revised 11-17."  Ex. B at i.

573.    The document contains no indication of the nature of any of the revisions.

574.    The document's metadata indicates that it was last modified on December 5, 2017.  On information and belief, additional changes to the policy were made between December 1, 2017, and December 5, 2017.

575.    On information and belief, the court system's state-wide sexual harassment policy was revised directly in response to Plaintiff's complaints about Hoffman and the manner in which Plaintiff reported or pursued those complaints.

576.    On information and belief, in the midst of broad, national attention to the problem of sex-based harassment in the workplace, Marks is the only government official in the entire country to make comparable changes to the sexual harassment policy of an entire branch of government.

**VI.**    **SYSTEMIC DISCRIMINATION AND RETALIATION IN THE NEW YORK STATE COURT SYSTEM**

577.    This case raises a number of systemic issues.

578.    The named Defendants include the chief executives and administrators of the New York judiciary.  They are responsible for setting and enforcing the policies and procedures of an entire branch of state government.  Their conduct is inherently systemic, egregious, and best understood in the specific institutional context of the New York State court system.

### *A Longstanding Problem*

579.    In 1986, following an extensive and wide-ranging 22-month investigation, a special task force created to examine gender bias in the New York State court system reported widespread sex-based discrimination in virtually all aspects of the culture and operation of the court system.

580.    In a disturbing 313-page report, the task force described pervasive gender bias in the court system's hiring practices, judicial decision-making, and judicial conduct, as well as persistent mistreatment of female litigants, attorneys, and court employees.  *See Report of the New York Task Force on Women in the Courts*, 15 Fordham Urb. L. J. 1 (1986).

581.    The task force report led to the creation of the New York Judicial Committee of Women in the Courts, a standing committee charged with implementing the report's recommendations and working to eliminate gender bias in the court system.

582.    Regarding workplace sexual harassment of court system employees, the task force and committee made a number of findings, including:

   a.    many female court system employees were unaware that sexual harassment in the workplace is illegal;

b.    many female court system employees did not know where to make complaints about sexual harassment;

c.    some female court system employees experienced sexual harassment so frequently that they perceived it as an unavoidable part of their job;

d.    some female court system employees experienced incidents of sexual harassment they considered "not serious" because supervisors who were notified put a stop to the harassment by talking to the perpetrator;

e.    some female court system employees experienced incidents of sexual harassment they considered "serious" because supervisors who were notified were unwilling to force the issue and make the perpetrator stop;

f.    some female court system employees feared retaliation, including being fired, for objecting to inappropriate gender-based requests and conduct by judges and supervisors; and

g.    court system employees experiencing sexual harassment were reluctant to come forward with complaints even if the harassment caused them great distress.

583.    In response to these findings, the New York State court system introduced and publicized new formal and informal complaint procedures.  In addition, the court system established local Anti-Discrimination Panels staffed with trained volunteers who could provide employees with advice and, when appropriate, help address instances of harassment by acting as intermediaries on employees' behalf.

584.    In 1992, the Committee on Women in the Courts drafted and distributed a booklet titled "Sexual Harassment in the Workplace."  *See* N.Y. State Judicial Comm. on Women in the

Courts, *Annual Report* 42-54 (Oct. 1992), https://www.nycourts.gov/ip/womeninthecourts/ publications.shtml (follow "1992" hyperlink).  This booklet became the basis for the court system's first official sexual harassment policy.  The committee continued updating and contributing to the court system's official policy over the next decade.

585.    The final policy document that resulted from these efforts, titled "Sexual Harassment Policy and Procedure," included the following content:

586.    A clear statement that workplace sexual harassment is illegal; the full definition of workplace sexual harassment as set forth in federal regulations; examples of conduct that may constitute workplace sexual harassment; statements encouraging employees to submit complaints; statements encouraging employees to address harassment early; statements encouraging employees to approach supervisors directly; a clear statement that all supervisors are responsible for enforcing the court system's sexual harassment policy and assisting employees experiencing harassment; a clear statement that retaliation in response to complaints is illegal; advice on interacting with supervisors; advice on interacting with the perpetrator; advice on keeping a written record; descriptions of formal and informal complaint avenues available within the court system; a description of the court system's formal complaint procedure, including an appeal process; information about confidentiality; a description of the court system's Anti-Discrimination Panels; and broad language expressing a strong commitment to addressing workplace sexual harassment in the court system.  *See Sexual Harassment Policy and Procedure* (Oct. 2008), http://www.nycourts.gov/ad3/ppforms/ (follow "Sexual Harassment Handbook" hyperlink) (last visited Jul. 23, 2018).

587.    In 2002, the Committee on Women in the Courts issued its last state-wide report and, for the most part, delegated its work to local committees.

588.     Subsequently, the court system's sexual harassment policy was not further updated and appears to have been neglected.  On information and belief, the last substantive revision to the policy occurred in approximately 1999.  From October 2008 to November 2017, the policy was not revised at all.  *Compare id. with* Ex. A (the two documents are virtually identical).

589.     During the past decade-and-a-half, the court system has regularly been subject to sexual harassment and discrimination lawsuits and complaints by employees and former employees.  On information and belief, during this period, the frequency of sexual harassment litigation against the court system has steadily increased.

590.     In court, the court system has repeatedly defended itself by claiming that it was unaware of the alleged conduct, by pointing to the availability of internal complaint avenues, and by faulting employees for failing to report harassment.

591.     In 2009, in a sexual harassment case brought by a court system employee, the Second Circuit issued a decision reminding the court system that "when an employee's complaint raises the specter of sexual harassment, a supervisor's purposeful ignorance of the nature of the problem… will not shield an employer from liability."  *Duch v. Jakubek*, 588 F. 3d 757, 766 (2d Cir. 2009).

592.     Court system administrators have been aware for decades, and have been continually and repeatedly reminded for decades, that supervisors and administrative judges ignore, suppress, and fail to respond to internal harassment complaints by employees.

593.     On information and belief, the court system's sexual harassment policy has not been enforced for decades.

594.    On information and belief, with respect to complaints about judges, court system supervisors and administrators regularly and intentionally evade the jurisdiction of, and fail to refer complaints to, the New York State Commission on Judicial Conduct.

595.    Today, the court system appears to be led by administrators who, as a matter of policy, are knowingly and intentionally reverting decades of progress on workplace sexual harassment within the New York judiciary.

596.    On approximately December 1, 2017, Marks deleted approximately half of the court system's sexual harassment policy, including nearly all of the content described in ¶ 586, thereby unilaterally reverting substantial and concrete efforts to address a longstanding and persistent problem within the court system.  *See also supra* Section V.

597.    DiFiore and Fahey et al. have either directly approved or allowed that policy change to persist, without comment, for over eight months.

### *No Complaint Process*

598.    As of 2018, the New York State court system has no functioning complaint process for addressing workplace harassment, discrimination, and retaliation by a New York State judge.

599.    On paper, the court system purports to provide employees with multiple avenues of complaint.  The court system's official sexual harassment and discrimination policies contain cursory descriptions of several formal and informal complaint channels.

600.    However, these policies are fraudulent; they are not enforced, and the purported complaint avenues do not exist.

601.    In reality, there are only two internal paths available to an employee subject to harassment, discrimination, and/or retaliation by a New York State judge.  Both paths are retaliatory.

602.    The first, "unofficial" path is a transfer of the employee to a different position.

603.    This unofficial transfer is not part of the complaint process and is, in fact, contingent on the employee's agreement not to express, document, or pursue a complaint.

604.    The unofficial transfer process works, approximately, as follows:

605.    The employee is informed that her employment is at will and can be terminated at any time.  If the employee is willing to characterize the underlying issue as an "incompatibility" or a "professional mismatch," she is not fired.  Instead, she is given several weeks to "voluntarily" find a new position within the court system.

606.    This arrangement is typically brokered by the Deputy Chief Administrative Judge.

607.    Because information about court system job openings is not publicly available, the employee cannot find a new position on her own and becomes dependent on the Deputy Chief Administrative Judge to obtain a new placement.  *See infra* Noncompetitive Hiring.

608.    This process was described separately by both Hoffman and Brown and appears to be a common, longstanding practice in the court system.  Hoffman told Plaintiff: "I spoke to Judge Silver and he told me that what happens in this situation – whenever there is a professional mismatch between a judge and a law clerk – is that they don't fire the law clerk immediately, but they give them a few weeks to find a transfer."  Hoffman then instructed Plaintiff to call Silver directly to arrange her transfer.  Brown separately told Plaintiff that she had sat "many times" in the office of Fern Fisher – Silver's predecessor – to assist with such transfers.

609.    From the court system's perspective, the principal advantage of an unofficial transfer is that it avoids the appearance of an adverse employment action.  The employee seems to be leaving her position voluntarily.  No complaint is ever documented.

610.    For the employee, who is being threatened with termination and whose job and legal career are at substantial risk, an unofficial transfer can present an opportunity for a promotion.

611.    This arrangement is plainly and transparently a bribe.

612.    If the employee forgoes a complaint, she is rewarded with a reserved, public sector, patronage job that is not publicly advertised, that she normally would not know about, and that she otherwise would have no access to.  *Id.*

613.    The second, "official" path consists of an investigation by the court system's Inspector General.

614.    This path is mandatory for any employee who insists on documenting, expressing, or pursuing complaints about a judge.  All other purported complaint avenues are cut off and the employee is repeatedly steered and coerced to submit to an investigation by the Office of the Inspector General.  All other employment-related matters are held hostage and put on hold.  If the employee does not immediately submit to the Inspector General without objection, the employee is accused of withholding information and of not participating in the complaint process.

615.    Notably, the Inspector General lacks the jurisdiction to investigate complaints against judges.  *See supra* Kay-Ann Porter.

616.    Furthermore, the Inspector General does not solicit, acknowledge, or investigate written complaints.  Complaints about judges must be submitted orally and in person to Porter, the Managing Inspector General for Bias Matters.

617.    In addition, the Inspector General imposes strict secrecy and deprives the complaining employee of all information, including information related to the Inspector General's process and activities.  For example, Porter does not respond to, address, or acknowledge any objections to the practices or policies of the Inspector General.

618.    Finally, at the conclusion of its investigation, the Inspector General does not disclose its findings or reports.  Thus, the activities of the Inspector General are not subject to any monitoring, oversight, or appeal.  Simply put, an employee cannot appeal a secret process or findings that are not disclosed.

619.    In sum, the court system's Inspector General serves no necessary or constructive function in the complaint process.  Its primary objectives are to maintain secrecy, suppress the documentation of complaints, prevent employees from documenting the complaint process, prevent complaints from reaching judges and/or administrators who have the ability and immediate obligation to respond, conceal the court system's findings and responses to complaints, and help prepare for litigation against complaining employees.

620.    Throughout this "official" process, complaining employees are kept in administrative limbo, repeatedly dissuaded from maintaining their complaints, and continually subjected to retaliation.

621.    If an employee persists in documenting or pursuing her complaints against a judge, the employee is simply fired.

622.    The two paths described above are the *only* paths available within the court system for addressing harassment, discrimination, and retaliation by judges.

623.    Plaintiff exhausted and documented the entirety of the court system's complaint process.  It is non-existent.

### Noncompetitive Hiring

624.    The history of corrupt hiring practices in New York's judicial branch is long and well documented.  For over a century, hiring and appointments in the New York State court system – of judges and of nonjudicial employees alike – have been the subject of scrutiny, investigations, public outcry, and widespread criticism and concern.

625.    Today, the overwhelming majority of attorney jobs in the New York State court system – including thousands of public positions for law clerks, court attorneys, pool attorneys, administrative and/or managerial attorneys, etc. – are not subject to competitive hiring.

626.    Attorney hiring in the court system works, approximately, as follows:

627.    First, the overwhelming majority of job openings for attorneys are not publicly listed or advertised.  For example, neither Hoffman, Scarpulla, nor Silver publicly advertise openings for either their term-limited law clerk positions or their permanent court attorney positions.

628.    Second, information about job openings is shared by judges and court system administrators through informal whisper networks.  For example, a judge on the Court of Appeals might email a judge on the Supreme Court to say, approximately: "You didn't hear it from me, but two positions are opening up in the First Department."

629.    Third, information about an opening is shared with a favored candidate – e.g., a family member, a friend, a friend of a political ally, etc. – and the candidate is instructed to apply

for the position.  For example, a judge's grandson might be told to apply for a position that is not publicly advertised.

630.     Fourth, connected patrons and sponsors may call, advocate, and exert pressure in favor of the candidate.  Such advocacy can be quite aggressive, sometimes culminating in shouting and threats if the hiring party resists.

631.     The pressure to make patronage hires severely restricts the pool of candidates for attorney positions in numerous ways.  For example, even judges who seek to employ competent attorneys refuse to publicly advertise positions for fear of being forced to make patronage hires and instead rely on personal or anonymous networks to find candidates.

632.     This is almost entirely a closed hiring process.

633.     Neither members of the public nor court system employees can learn about or apply for these public sector jobs.

634.     A small subset of attorney job openings in the New York State court system are publicly listed and are ostensibly subject to a "panel selection process."  However, the appearance of a competitive hiring process for even these positions is misleading.  Panel selection openings are frequently awarded to predetermined candidates; rejection notices are not sent out; hiring records are kept to a minimum; and, often, interviews are not conducted.

635.     According to Scarpulla, publicly posted positions are fraudulent and candidates are preselected: "Those job postings are not real.  This has nothing to do with merit.  It has to do with who is next in line and who calls on behalf of that person."

636.     In short, attorney jobs at all levels of the New York court system are acquired primarily through friends, family members, and political patrons.  Jobs are used as bargaining

chips and traded for political favors.  Merit and professional competence are secondary factors in hiring and appointment decisions, if they are considered at all.

637.    Furthermore, the climate of secrecy, fear, and corruption surrounding hiring and employment in the New York court system is astounding.  For example, Scarpulla warned Plaintiff not to ask questions about employment-related matters in writing because she might get fired.  She instructed her law clerks not to discuss employment issues over work email because their communications might be monitored.

638.    The court system's noncompetitive hiring practices have caused, and continue to cause, systemic damage to the court system, its employees, the State of New York, and the public.

639.    First, the court system's noncompetitive hiring practices directly result in ongoing systemic discrimination, deterrence, suppression, and retaliation in response to protected opposition by court system employees.

640.    Closed access to job information in the New York court system:

    a.    functions as a powerful deterrent to employees who want to report harassment or discrimination but fear losing access to job information;

    b.    allows otherwise public job information to be used as a bargaining chip to bribe and obtain silence from employees experiencing harassment or discrimination; and

    c.    serves as a mechanism of retaliation to punish employees who report harassment or discrimination.

641.     Plaintiff was repeatedly deterred and delayed from opposing and reporting Hoffman's conduct, and from pursuing complaints against Hoffman, by her lack of access to job information within the court system.

642.     Plaintiff was repeatedly promised job information and job opportunities within the court system on the condition that she did not report or complain about Hoffman's conduct.

643.     When Plaintiff persisted in reporting and objecting to Hoffman's conduct, Plaintiff was immediately and permanently deprived of job information and job opportunities within the court system.

644.     On information and belief, the New York State court system's noncompetitive hiring practices have directly resulted in systemic and ongoing underreporting of sexual harassment and discrimination and have directly enabled and contributed to systemic and ongoing retaliation against employees reporting sexual harassment and discrimination.

645.     Second, decades of noncompetitive hiring practices have resulted in widespread professional incompetence at all levels of the court system's workforce.  Professional incompetence in the New York court system is devastating, pervasive, and routinely reported in the press.  A large proportion of New York State court system judges, lawyers, and administrators routinely fail to demonstrate the basic competency and good faith essential to the performance of their public functions.

646.     There is no plausible rational basis for the New York State court system to fill public job openings in the New York State civil service by engaging in noncompetitive hiring practices by, for example: knowingly and intentionally failing to disclose and advertise information related to public job openings; knowingly and intentionally failing to conduct competitive interviews and selection processes; knowingly and intentionally awarding public

positions on the basis of family, personal, and political relationships rather than on the basis of professional merit; knowingly and intentionally failing to create or maintain records and documentation related to hiring decisions; and knowingly and intentionally permitting internal lobbying and interference in the public hiring process by connected political patrons, relatives, and administrators.

647.    The New York court system's noncompetitive employment practices are discriminatory as applied, detrimental to the quality of New York State's civil service, and undermine the state's express policy goals of maintaining a competent, merit-based workforce.

### *Culture of Retaliation*

648.    The Defendants in this case engaged in remarkably similar and often identical conduct.

649.    Sixteen of the named Defendants – all New York State judges or attorneys – simply ignored and/or refused to respond to written communications opposing unlawful harassment, discrimination, and retaliation.

650.    The stonewalling, deliberate indifference, and willful blindness by court system officials was overwhelming.  From October 8, 2017, to March 8, 2018, Plaintiff and Plaintiff's attorney sent court system officials approximately 51 written communications, totaling approximately 17,800 words, related to Plaintiff's harassment, discrimination, and retaliation complaints.

651.    Plaintiff received no meaningful response to any of these complaints.

652.    Court system officials repeatedly referred Plaintiff to other court system officials and then simply disappeared.  For example, Scarpulla refused to respond to written complaints, referred Plaintiff to Silver, and then disappeared.  Silver refused to respond to written

complaints, referred Plaintiff to Porter, and then disappeared.  Porter misrepresented her authority, refused to respond to written complaints, and then disappeared.  DeSole refused to respond to written complaints, demoted Plaintiff, referred Plaintiff to McConnell, and then disappeared.  McConnell refused to identify himself and referred Plaintiff to Evans.  Evans refused to respond to written complaints and then disappeared.  Marks refused to respond to written complaints, fired Plaintiff, and deleted half of the court system's sexual harassment policy.  DiFiore refused to respond to written complaints and referred Plaintiff to McConnell, who stated that DiFiore would not respond.  Fahey et al. refused to respond to written complaints and referred Plaintiff to Asiello, who stated that Fahey et al. would not respond.

653.    Defendants engaged in numerous additional patterns of retaliatory conduct.  Each of the following acts was performed by more than one Defendant:

654.    Defendants repeatedly denied knowledge of Plaintiff's complaints; insisted that Plaintiff had not made any complaints; insisted that Plaintiff had not made sufficiently detailed complaints; asserted that Plaintiff was not interested in pursuing complaints; failed to report and delayed reporting Plaintiff's complaints; cut off complaint avenues and terminated complaint processes initiated by Plaintiff; berated Plaintiff for documenting her complaints; prevented Plaintiff from documenting her complaints; prevented Plaintiff from documenting the complaint process; refused to discuss the complaint process or the potential outcomes of the complaint process; refused to respond to Plaintiff's objections regarding the complaint process; refused to identify decision-makers; blocked Plaintiff's access to decision-makers; refused to investigate Plaintiff's complaints; refused to question supervisors with knowledge of Plaintiff's complaints; refused to separate Plaintiff's employment-related matters (e.g., interview, hiring, transfer) from Plaintiff's complaints; made Plaintiff's employment-related matters contingent on whether,

when, and how Plaintiff pursued her complaints; attempted to bargain with, bribe, and

incentivize Plaintiff to drop her complaints (e.g., by promising or threatening to withhold a job,

job information, transfer, references); refused to explain or justify employment-related decisions

(e.g., refusing to hire, refusing to transfer, demoting, firing); isolated Plaintiff from supervisors

and coworkers; instructed Plaintiff not to talk to others; cut contact with Plaintiff; became

unavailable to Plaintiff; promised to follow up with Plaintiff and failed to do so; issued repeated,

unexplained requests and commands to Plaintiff; ignored Plaintiff's objections to repeated,

unexplained requests and commands; tried to portray Plaintiff as uncooperative; threatened to

fire Plaintiff; responded to Plaintiff's communications with repetitive or nonsensical replies; took

possession of, distributed, and redirected Plaintiff's confidential communications without notice

or permission; fragmented and obscured the complaint process, the decision-making process, the

investigative process, and the documentary record.

655.   These were not isolated acts by a few state officials.

656.   Numerous court system judges and attorneys acted in identical patterns, as if they

were being coordinated, engaging in a practiced routine, or as if they implicitly understood what

was expected of them – refuse to respond to written communications, deny knowledge and

suppress evidence of complaints, do not ask questions on the record, prevent documentation,

protect supervisors from information, and disappear.

657.   Defendants' conduct reveals a widespread culture of retaliation and deliberate

indifference within the administration of the New York State court system.

658.   The conduct of the Defendants also represents a staggering failure of judicial self-

governance, institutional management, and policymaking.

659.    At the exact same time that Defendants were ignoring or refusing to respond to Plaintiff's communications, Marks was deleting half of the court system's state-wide sexual harassment policy.

660.    All of the revisions to the policy were directly related to the substance of Plaintiff's complaints or to the manner in which Plaintiff pursued her complaints.  Thus, to date, Marks's revision of the court system's sexual harassment policy is the most direct and substantive response that Plaintiff has received to any of her numerous harassment, discrimination, and retaliation complaints.

661.    Given the substance of the revision, Defendants' response to the entirety of Plaintiff's complaints appears to be that:

    a.    the court system does not recognize that sex-based workplace harassment and retaliation is illegal;

    b.    court system employees should not report harassment and retaliation to supervisors; and

    c.    supervisors have no obligation to respond to workplace harassment and retaliation beyond referring complaints to the Office of the Inspector General.

662.    These are remarkable positions for a court system to adopt – each is directly contrary to law.

663.    Plaintiff reported her complaints throughout the entire administrative structure of the New York judiciary.  She received no response.

664.    At the highest level of the court system's executive leadership, the Chief Judge and the full panel of the Court of Appeals told Plaintiff that they simply would not acknowledge

or respond to her communications.  DiFiore told Plaintiff that the only forum in which she would respond to Plaintiff was in court.  Fahey et al. absurdly faulted Plaintiff for failing to comply with the Rules of Practice by contacting them directly.

665.    Defendants were given numerous opportunities to respond, to state a position, and to voluntarily remedy ongoing legal violations.  They refused.

666.    Knowing the cost to Plaintiff in terms of time, money, reputation, and career of pursuing a legal remedy in the courts – and expecting taxpayers to ultimately cover any resulting judgment and costs – Defendants purposefully calculated that they would rather have New York State sustain a lawsuit than voluntarily comply with federal and state discrimination law.

667.    The facts of this case reveal deeply perverse incentives among state officials; open, documented, and intentional legal violations by numerous state judges and attorneys; and widespread institutional hostility to harassment, discrimination, and retaliation law within the New York State court system.

668.    The New York State judiciary will not police itself voluntarily.  This is a set of facts that calls for personal liability, punitive damages, systemic injunctive relief, and external intervention and oversight of the New York State judiciary.

## VII.  <u>COUNTS</u>

### <u>Count I</u>

**Equal Protection Under § 1983 – Retaliation:**

**Defendants in their individual capacities**

669.    Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

670.    Hoffman, Scarpulla, Silver, Marks, DiFiore, McConnell, DeSole, Porter, Evans, Sattler, Reo, Fahey, Feinman, Garcia, Rivera, Stein, and Wilson unlawfully retaliated against Plaintiff for opposing sex- and race-based harassment, discrimination, and retaliation.

671.    Defendants' retaliation deprived Plaintiff of her right to equal protection guaranteed by the Fourteenth Amendment to the United States Constitution.

672.    Defendants' retaliation caused Plaintiff damages enumerated below.

### <u>Count II</u>

**Supervisory Liability Under § 1983 – Retaliation:**

**Defendants in their individual capacities**

673.    Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

674.    Scarpulla, Silver, Marks, DiFiore, McConnell, DeSole, Porter, Evans, Sattler, Reo, Fahey, Feinman, Garcia, Rivera, Stein, and Wilson directly participated in retaliation against Plaintiff for opposing sex- and race-based harassment, discrimination, and retaliation; failed to remedy retaliation against Plaintiff after being informed through reports or appeals; created and ratified a policy and custom that sanctioned retaliation against Plaintiff; allowed that

policy and custom to continue; intentionally or with gross negligence supervised and failed to supervise subordinates who retaliated against Plaintiff; and/or failed to act on information that retaliation against Plaintiff was occurring.

675.     Defendants' conduct deprived Plaintiff of her right to equal protection guaranteed by the Fourteenth Amendment to the United States Constitution.

676.     Defendants' conduct caused Plaintiff damages enumerated below.

## Count III

### Conspiracy Under § 1983 – Retaliation:

### Defendants in their individual capacities

677.     Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

678.     Hoffman, Scarpulla, Silver, Marks, McConnell, DeSole, Porter, Evans, and Reo acted pursuant to explicit and/or implicit agreements and engaged in coordinated and overt acts for the purpose of retaliating against Plaintiff for opposing sex- and race-based harassment, discrimination, and retaliation.

679.     Defendant's conduct deprived Plaintiff of her right to equal protection guaranteed by the Fourteenth Amendment to the United States Constitution.

680.     Defendants' conduct caused Plaintiff damages enumerated below.

## Count IV

### Equal Protection Under § 1983 – Harassment & Discrimination:

### Hoffman in his individual capacity

681.　Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint, including the allegations in ¶¶ 43-177, as if fully set forth herein.

682.　Hoffman unlawfully harassed and discriminated against Plaintiff on the basis of her sex and race, subjected Plaintiff to sex- and race-based hostile work environment harassment and discrimination, subjected Plaintiff to sex-based quid pro quo harassment and discrimination, and subjected Plaintiff to sex- and race-based stereotyping harassment and discrimination.

683.　Hoffman's harassment and discrimination deprived Plaintiff of her right to equal protection guaranteed by the Fourteenth Amendment to the United States Constitution.

684.　Hoffman's harassment and discrimination caused Plaintiff damages enumerated below.

## Count V

### Supervisory Liability Under § 1983 – Harassment & Discrimination:

### Defendants in their individual capacities

685.　Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

686.　Scarpulla, Silver, Marks, DiFiore, McConnell, DeSole, Porter, Evans, Sattler, Reo, Fahey, Feinman, Garcia, Rivera, Stein, and Wilson failed to remedy Hoffman's sex- and race-based harassment and discrimination against Plaintiff after being informed through reports or appeals; created and ratified a policy and custom that sanctioned Hoffman's sex- and race-

based harassment and discrimination against Plaintiff; allowed that policy and custom to continue; intentionally or with gross negligence supervised and failed to supervise Hoffman; and/or failed to act on information that sex- and race-based harassment and discrimination against Plaintiff was occurring.

687.    Defendants' conduct deprived Plaintiff of her right to equal protection guaranteed by the Fourteenth Amendment to the United States Constitution.

688.    Defendants' conduct caused Plaintiff damages enumerated below.

## Count VI

### Equal Protection – Noncompetitive Hiring Practices:

### DiFiore in her official capacity

689.    Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint, including the allegations in ¶¶ 185, 225, 282, 302, 624-647, as if fully set forth herein.

690.    Under DiFiore's supervision and administration, the New York State court system engages in ongoing noncompetitive hiring practices that, as applied, discriminate against Plaintiff and other harassment, discrimination, and retaliation victims and complainants in violation of their right to equal protection guaranteed by the Fourteenth Amendment to the United States Constitution.

691.    Plaintiff seeks injunctive relief enumerated below.

**Count VII**

**Equal Protection – Sexual Harassment Policy:**

**DiFiore in her official capacity**

692.     Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint, including the allegations in ¶¶ 543-576, 579-597, as if fully set forth herein.

693.     Under DiFiore's supervision and administration, the New York State court system continues to implement a revised sexual harassment policy that in its purpose and effect, or as applied, discriminates against Plaintiff and other harassment, discrimination, and retaliation victims and complainants in violation of their right to equal protection guaranteed by the Fourteenth Amendment to the United States Constitution.

694.     Plaintiff seeks injunctive relief enumerated below.

**Count VIII**

**Equal Protection – Bias Complaint Procedures & Practices:**

**DiFiore in her official capacity**

695.     Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint, including the allegations in ¶¶ 3-9, 598-623, as if fully set forth herein.

696.     Under DiFiore's supervision and administration, the New York State court system continues to implement inadequate bias complaint procedures and practices that in their purpose and effect, or as applied, discriminate against Plaintiff and other harassment, discrimination, and

retaliation victims and complainants in violation of their right to equal protection guaranteed by the Fourteenth Amendment to the United States Constitution.

697.    Plaintiff seeks injunctive relief enumerated below.

## Count IX

### Due Process Under § 1983:

### Defendants in their individual capacities

698.    Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

699.    Plaintiff possesses a property interest in her continued employment as a principal court attorney in the New York State court system that derives from Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, the New York City Human Rights Law, the New York Civil Service Law, and the New York State court system's Sexual Harassment and Discrimination Policies and Procedures.

700.    Plaintiff also possesses a property interest in a transfer within the New York State court system that derives from Plaintiff's collective bargaining agreement.

701.    Plaintiff's property interests are protected by the following due process rights:

    a.    the right arising under Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, the New York City Human Rights Law, and the court system's Sexual Harassment and Discrimination Policies and Procedures to not be terminated from employment without any explanation or response after pursuing internal sex- and race-based harassment, discrimination, and retaliation complaints against a supervisor;

b.      the right arising under the court system's Sexual Harassment and

Discrimination Policies and Procedures to not be terminated from

employment following a bias investigation conducted by the court

system's Office of the Inspector General without being informed of, and

without being given an opportunity to appeal, the outcome of that

investigation;

c.      the right arising under New York Civil Service Law § 75(1)(c) to not be

terminated from employment without a disciplinary hearing showing

incompetency or misconduct; and

d.      the right arising under Section 9.15 of Plaintiff's collective bargaining

agreement to not be denied a transfer request without a showing that such

a request cannot be accommodated.

702.    With respect to subparagraph (c), Plaintiff was actually or de facto employed as a

law clerk and principal court attorney in the non-competitive class of the New York State civil

service for over five years.  Despite the New York State court system's designation to the

contrary, Plaintiff was not a confidential employee.  *Matter of Lippman v. Pub. Emp't Relations

Bd.*, 263 A.D.2d 891, 903 (App. Div. 3d Dep't 1999) (holding that law assistants to judges are

not "confidential" within the meaning of the New York Civil Service Law).  Accordingly,

Plaintiff was not an at-will employee.

703.    Silver, Marks, McConnell, DeSole, Porter, and Evans deprived Plaintiff of

property interests in her employment in violation of Plaintiff's right to procedural due process

guaranteed by the Fourteenth Amendment to the United States Constitution.

704.    Defendants' actions caused Plaintiff damages enumerated below.

## Count X

## First Amendment Under § 1983 – Retaliation:

## Defendants in their individual capacities

705.    Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

706.    Plaintiff engaged in constitutionally protected speech on matters of public concern, including, but not limited to, speech concerning ongoing discrimination, harassment, and retaliation within the New York State court system; the absence of a functioning harassment, discrimination, and retaliation complaint process within the New York State court system; misuse of the New York State court system's Office of the Inspector General by court system judges and officials; discriminatory and corrupt hiring practices within the New York State court system; and a retaliatory revision of the New York State court system's sexual harassment policy.

707.    Silver, Marks, McConnell, DeSole, Porter, and Evans unlawfully retaliated against Plaintiff for engaging in constitutionally protected speech in violation of the First Amendment to the United States Constitution.

708.    Defendants' retaliation caused Plaintiff damages enumerated below.

**Count XI**

**Article VI § 28(c) of the New York Constitution:**

**Defendants in their individual capacities**

709.     Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint, including the allegations in ¶¶ 545, 548, 567-571, as if fully set forth herein.

710.     Marks, DiFiore, Fahey, Feinman, Garcia, Rivera, Stein, and Wilson promulgated the New York State court system's revised state-wide sexual harassment policy in violation of the procedures set forth in Article VI § 28(c) of the New York State Constitution.

711.     Plaintiff seeks declaratory relief enumerated below.

**Count XII**

**NYSHRL and NYCHRL – Retaliation:**

**Defendants in their individual capacities**

712.     Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

713.     Hoffman, Scarpulla, Silver, Marks, DiFiore, McConnell, DeSole, Porter, Evans, Sattler, Reo, Fahey, Feinman, Garcia, Rivera, Stein, and Wilson unlawfully retaliated and/or aided and abetted retaliation against Plaintiff for opposing sex- and race-based harassment, discrimination, and retaliation.

714.     Defendants' retaliation violated the New York State Human Rights Law and the New York City Human Rights Law.

715.     Defendants' retaliation caused Plaintiff damages enumerated below.

## Count XIII

### NYSHRL and NYCHRL – Harassment & Discrimination:

### Defendants in their individual capacities

716.    Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

717.    Hoffman unlawfully harassed and discriminated against Plaintiff on the basis of her sex and race, subjected Plaintiff to sex- and race-based hostile work environment harassment and discrimination, subjected Plaintiff to sex-based quid pro quo harassment and discrimination, and subjected Plaintiff to sex- and race-based stereotyping harassment and discrimination.

718.    Scarpulla, Silver, Marks, DiFiore, McConnell, DeSole, Porter, Evans, Sattler, Reo, Fahey, Feinman, Garcia, Rivera, Stein, and Wilson aided and abetted Hoffman's harassment and discrimination.

719.    Defendants' conduct violated the New York State Human Rights Law and the New York City Human Rights Law.

720.    Defendants' conduct caused Plaintiff damages enumerated below.

## Count XIV

### Negligence and Negligent Supervision:

### Defendants in their individual capacities

721.    Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

722.    Scarpulla, Silver, Marks, DiFiore, McConnell, DeSole, Porter, Evans, Sattler, Reo, Fahey, Feinman, Garcia, Rivera, Stein, and Wilson owe a duty to safeguard Plaintiff from

the intentional and/or negligent torts and unlawful conduct committed against Plaintiff by other Defendants.

723.     Defendants breached their duty to Plaintiff by intentionally or negligently supervising, failing to supervise, permitting, contributing to, and/or failing to remedy the intentional and/or negligent torts and unlawful conduct committed against Plaintiff by other Defendants.

724.     Defendants' negligence and/or negligent supervision caused Plaintiff damages enumerated below.

## Count XV

### Intentional Infliction of Emotional Distress:

### Defendants in their individual capacities

725.     Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

726.     Hoffman, Scarpulla, Silver, Marks, DiFiore, McConnell, DeSole, Porter, Evans, Sattler, Reo, Fahey, Feinman, Garcia, Rivera, Stein, and Wilson intentionally and/or recklessly engaged in extreme and outrageous conduct causing Plaintiff severe emotional distress.

727.     Throughout the events described herein and subsequently, Plaintiff suffered severe and sustained emotional distress, anger, and anguish, as well as, at various times, rapid weight loss, sensory disorientation, fear, and physical pain.

728.     Defendants' extreme and outrageous conduct caused Plaintiff damages enumerated below.

**Count XVI**

**Fraud:**

**Defendants in their individual capacities**

729.     Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint, including the allegations in ¶¶ 231, 296, 356, 409, 443, as if fully set forth herein.

730.     Scarpulla, Silver, DeSole, Porter, Evans, and Reo knowingly made various fraudulent representations and/or omissions.

731.     Plaintiff reasonably relied on those representations and/or omissions to her detriment.

732.     Defendants' fraud caused Plaintiff damages enumerated below.

**Count XVII**

**Fraudulent Inducement:**

**Hoffman and Sattler in their individual capacities**

733.     Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint, including the allegations in ¶¶ 173, 533-534, and ¶¶ 69, 71, 82, 86-87, 105, 166, 170, as if fully set forth herein.

734.     Hoffman and Sattler made fraudulent representations and/or omissions for the purpose of inducing Plaintiff to accept a position as Hoffman's principal court attorney.

735.     Plaintiff reasonably relied on those representations and/or omissions and accepted a position as Hoffman's principal court attorney to her detriment.

736.     Hoffman and Sattler's conduct caused Plaintiff damages enumerated below.

## Count XVIII

### Breach of Contract:

### Hoffman in his individual capacity

737.     Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint, including the allegations in ¶ 173 and ¶¶ 69, 71, 82, 86-87, 105, 113, 127-130, 136-137, 170, as if fully set forth herein.

738.     Hoffman entered into written and oral contracts with Plaintiff and into a separate oral contract with Scarpulla to employ Plaintiff as a principal court attorney who would perform legal work in accordance with her title and job description.

739.     Hoffman breached these contracts.

740.     Hoffman's breach caused Plaintiff damages enumerated below.

## Count XIX

### Defamation:

### Hoffman in his individual capacity

741.     Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint, including the allegations in ¶¶ 35-39, 59, 116, 129, 134, 137-138, 145, 161-162, 179, 194-196, 204, 221, 225, 243-246, 282, 298, as if fully set forth herein.

742.     Hoffman made false and defamatory statements to Silver and Scarpulla regarding Plaintiff's professional work ethic, abilities, and character causing significant and grave damage to Plaintiff's professional reputation.

743.     Hoffman made these statements with actual malice.

744.     Hoffman's defamation caused Plaintiff damages enumerated below.

## Count XX

### Tortious Interference With Prospective Contractual Relations:

### Hoffman in his individual capacity

745.     Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint, including the allegations in ¶¶ 133-138, 145, 190-191, 194-196, 201, 203, 205, 221, 242-244, 246, 282, 298, as if fully set forth herein.

746.     Silver intended to hire Plaintiff as his principal court attorney and to enter into an employment relationship with Plaintiff.

747.     Hoffman intentionally and wrongfully prevented Silver from hiring Plaintiff.

748.     Hoffman's interference caused Plaintiff damages enumerated below.

## Count XXI

### Tortious Interference With Business Relations:

### Hoffman in his individual capacity

749.     Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint, including the allegations in ¶¶ 38-39, 137-138, 145, 179, 185, 194-198, 204, 210-211, 225, as if fully set forth herein.

750.     Plaintiff enjoyed a professional relationship with Scarpulla with the likelihood of substantial benefit to Plaintiff's future career as an attorney.

751.     Hoffman intentionally and wrongfully disrupted that relationship.

752.     Hoffman's interference caused Plaintiff damages enumerated below.

## Count XXII

**Promissory Estoppel, Quantum Meruit, and Unjust Enrichment:**

**Scarpulla in her individual capacity**

753.    Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint, including the allegations in ¶¶ 38-39, 179, 223-225, 229, 232, as if fully set forth herein.

754.    Plaintiff in good faith invested substantial time, effort, and skill into the professional work she performed for Scarpulla with the expectation of receiving the benefits of a judicial clerkship.

755.    Scarpulla also made explicit promises to provide Plaintiff with such benefits.  For example, Scarpulla repeatedly referred to a "mutually beneficial relationship" between Scarpulla and Plaintiff.  On one occasion, she told Plaintiff, "We have a mutually beneficial relationship. You've done a really good job and I want you to squeeze every drop you can get out of your clerkship."

756.    Plaintiff received neither the implicitly expected nor the explicitly promised benefits of a judicial clerkship with Scarpulla.

757.    Furthermore, Scarpulla's judicial career and reputation benefitted substantially as a result of Plaintiff's work and at Plaintiff's expense.

758.    It is against equity and good conscience to permit Scarpulla to retain any of the benefits she obtained at Plaintiff's expense.

759.    Scarpulla's conduct caused Plaintiff damages enumerated below.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

760.    Declare that the New York State court system's revised sexual harassment policy was promulgated in violation of the procedures set forth in Article VI § 28(c) of the New York State Constitution and is invalid.

761.    Enjoin DiFiore, in her official capacity, from condoning and permitting the court system to engage in noncompetitive hiring practices that unlawfully discriminate and retaliate against Plaintiff.

762.    Order DiFiore, in her official capacity, to establish, subject to the Court's approval, state-wide hiring standards and practices specifically tailored to the New York State court system that eliminate ongoing violations of, and allow for periodic monitoring to evaluate compliance with, the equal protection guarantee of the Fourteenth Amendment to the United States Constitution.

763.    Order DiFiore, in her official capacity, to strictly enforce such state-wide hiring standards and practices.

764.    Enjoin DiFiore, in her official capacity, from condoning and continuing to implement a sexual harassment policy that unlawfully discriminates and retaliates against Plaintiff.

765.    Order DiFiore, in her official capacity, to establish, subject to the Court's approval, a state-wide sexual harassment policy specifically tailored to the New York State court system and designed to eliminate ongoing violations of the equal protection guarantee of the Fourteenth Amendment to the United States Constitution.

766.     Order DiFiore, in her official capacity, to strictly enforce such a state-wide sexual harassment policy.

767.     Enjoin DiFiore, in her official capacity, from condoning and permitting the court system to continue implementing internal bias complaint procedures that unlawfully discriminate and retaliate against Plaintiff.

768.     Order DiFiore, in her official capacity, to establish, subject to the Court's approval, state-wide internal bias complaint procedures specifically tailored to the New York State court system that eliminate ongoing violations of, and allow for periodic monitoring to evaluate compliance with, the equal protection guarantee of the Fourteenth Amendment to the United States Constitution.

769.     Order DiFiore, in her official capacity, to strictly enforce such state-wide internal bias complaint procedures.

770.     Direct DiFiore, in her official capacity, to reinstate Plaintiff to a position and title at least equivalent to principal court attorney to the Deputy Chief Administrative Judge of the New York State court system.

771.     Given the substantial likelihood of future retaliation against Plaintiff by court system judges and administrators, enjoin DiFiore, in her official capacity, from permitting or enabling future retaliation against Plaintiff within the New York State court system.

772.     Order Hoffman, Scarpulla, Silver, Marks, DiFiore, McConnell, DeSole, Porter, Evans, Sattler, Reo, Fahey, Feinman, Garcia, Rivera, Stein, and Wilson to personally and jointly and severally make Plaintiff whole by providing compensation for past and future pecuniary losses resulting from Defendants' unlawful conduct, including but not limited to, back pay, front

pay, lost benefits, loss of professional reputation and standing, future lost earnings, and any other consequential losses, in amounts to be determined at trial.

773.    Order Hoffman, Scarpulla, Silver, Marks, DiFiore, McConnell, DeSole, Porter, Evans, Sattler, Reo, Fahey, Feinman, Garcia, Rivera, Stein, and Wilson to personally and jointly and severally make Plaintiff whole by providing compensation for past and future non-pecuniary losses resulting from Defendants' unlawful conduct, including but not limited to, mental anguish, emotional pain and suffering, stress, inconvenience, and loss of enjoyment of life, in amounts to be determined at trial.

774.    Order Hoffman, Scarpulla, Silver, Marks, DiFiore, McConnell, DeSole, Porter, Evans, Sattler, Reo, Fahey, Feinman, Garcia, Rivera, Stein, and Wilson to pay Plaintiff punitive damages to the extent that each Defendant's liability is based upon malicious, reckless, or reprehensible action and/or inaction, in amounts to be determined at trial and designed to punish Defendants' past unlawful conduct and to deter future unlawful conduct.

775.    Award reasonable attorney's fees and costs to Plaintiff.

776.    Grant such other and further relief as the Court may deem equitable and proper.


DATED: August 13, 2018                By:  _Anthy Vassilev_

Anthony Vassilev, Esq. (AV-8033)
43 West 43rd Street, Suite 54
New York, NY 10036
(646) 755-7636
tony@vassilev.cc

*Attorney for Plaintiff*